FILED
United States Court of Appeals
Tenth Circuit

November 29, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DWIGHT L. ALMOND, III and
KEVIN C. WEEMS,

      Plaintiffs-Appellants,

v.

UNIFIED SCHOOL DISTRICT #501,

      Defendant-Appellee.

No. 10-3315

---

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 5:07-CV-04064-JAR-KGS)**

---

Pantaleon Florez, Jr., Topeka, Kansas, for Plaintiffs-Appellants.

Patricia E. Riley, of Weathers, Riley & Sheppeard, LLP, Topeka, Kansas, for
Defendant-Appellee.

---

Before **MURPHY**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and
**GORSUCH**, Circuit Judge.

---

**GORSUCH**, Circuit Judge.

---

      Enacted in 2009, the Lilly Ledbetter Fair Pay Act governs how long parties

have to file "discrimination in compensation" claims. This case requires us to

consider what that phrase means. As it turns out, the phrase refers to situations in which a member of a protected class receives less pay than similarly situated colleagues — that is, unequal pay for equal work. Because the plaintiffs in this case don't raise an unequal pay for equal work claim, they do not benefit from the Act's comparatively generous deadlines and preexisting accrual rules apply. Under those rules, and as the district court observed, the plaintiffs' claims are untimely and must be dismissed.

This case stretches us back to 2003 when Kansas Unified School District #501 says it was facing serious budgetary straits. To help get back on course, the District claims, it decided to eliminate three positions, one of which was Dwight Almond's maintenance job. Rather than fire him, however, the District told Mr. Almond that he could transfer to a vacant custodial position at a lower pay grade. If Mr. Almond accepted the new position, the District promised, he could retain his current salary for two years before the lower pay associated with the new job kicked in. To all this Mr. Almond agreed in writing, and two years later the District reduced his salary just as it said it would.

In 2004, Kevin Weems found himself in the same predicament. As part of a putative effort to tighten its budget further, the District eliminated his position and Mr. Weems accepted a written offer allowing him to assume a lower paying job with the opportunity to keep his current salary for two years. Like Mr.

Almond, Mr. Weems's salary was to be (and two years later was) brought in line with his lower pay grade.

Eventually, Mr. Almond and Mr. Weems filed administrative charges alleging that the District's actions were motivated by unlawful age discrimination, not budget necessity. But with this came a wrinkle. The men didn't bring their administrative charges until 2006, even though the discrimination they alleged occurred in 2003 and 2004. And this fact posed a problem for the pair when they sought to take their claims to court. The district court held that the men had waited too long to seek administrative review — and that the delay had the effect of barring their lawsuits altogether.

While the plaintiffs' appeal of the district court's summary judgment decision was pending in this court, the statutory topography shifted. Congress passed the Ledbetter Act, a law specifically aimed at effecting changes to limitations law in the employment discrimination field. To allow the district court the opportunity to consider whether the Act rescued the plaintiffs' claims, rendering their otherwise untimely claims timely, the parties agreed to dismiss the appeal. In the end, though, the district court concluded that the Act offered the plaintiffs no help and now the case is back on appeal, requiring us to consider the timeliness of the plaintiffs' claims in light of both preexisting law and the Ledbetter Act.

We start with the first question first, asking whether preexisting law requires dismissal of the plaintiffs' claims. The Age Discrimination Employment Act ("ADEA") provides that "no civil action may be commenced" in federal court unless the would be plaintiff first files a grievance with the appropriate administrative agency — and does so "within 300 days after the alleged unlawful practice occurred" where (as here) a state administrative agency process exists to remedy the alleged discrimination. 29 U.S.C. § 626(d)(1)(B). Compliance with this administrative exhaustion requirement and its concomitant limitations period is a condition precedent to bringing suit. *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1167–68 (10th Cir. 2007).

But determining when exactly an "unlawful practice occur[s]" — when an ADEA claim accrues and the 300 day limitations clock starts running — isn't as simple as it might first appear. Does the clock start when the challenged employment practice is decided internally? When the decision is first announced to the plaintiff? When the plaintiff learns the decision was motivated by discriminatory animus? Or perhaps each and every time the plaintiff experiences some effect from the adverse decision?

In the absence of contrary directives from Congress, the Supreme Court has read into federal statutory limitations periods a relatively consistent rule. As formulated by the Court, the clock starts running when the plaintiff first knew or should have known of his injury, whether or not he realized the cause of his

injury was unlawful.  *See, e.g.*, *United States v. Kubrick*, 444 U.S. 111, 122 (1979); *Rotella v. Wood*, 528 U.S. 549, 555–56 (2000).

As applied to the employment discrimination context, the Court has explained, this rule generally means that a claim accrues when the disputed employment practice — the demotion, transfer, firing, refusal to hire, or the like — is first announced to the plaintiff.  *See Del. State Coll. v. Ricks*, 449 U.S. 250 (1980); *Haynes v. Level 3 Commc'n, LLC*, 456 F.3d 1215, 1222 (10th Cir. 2006). Sometimes, of course, an adverse employment decision isn't announced and the employee doesn't learn of it until much later — and in those circumstances courts revert to asking when the plaintiff did or a reasonable employee would have known of the employer's decision.  *See, e.g., Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1386 (3d Cir. 1994).  But in all events, and consistent with the general federal rule, an employee who discovers, or should have discovered, the *injury* (the adverse employment decision) need not be aware of the unlawful *discriminatory intent* behind that act for the limitations clock to start ticking.  (Whether and when the limitations clock, once it has started, might be equitably tolled is, of course, another matter.  *See Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450–51 (7th Cir. 1990)).

With these principles in hand, the question for us becomes when Mr. Almond and Mr. Weems first had or should have taken notice of the District's

allegedly discriminatory decision. The undisputed facts show that the answer is 2003 for Mr. Almond and 2004 for Mr. Weems. It was then that the District told the plaintiffs their jobs were being eliminated, then that the District announced the demotions, and then that the District revealed the future pay reduction associated with those demotions. And all this poses a problem for the plaintiffs, just as the district court held, because they filed their administrative charges in 2006, well past the 300 day deadline set by statute and much too late to be able to pursue their claims in federal court.

The plaintiffs respond by protesting that the most painful consequence of the District's transfer decision — the reduction in their pay — didn't take place in 2003 and 2004 but two years later, in 2005 and 2006, and so well within the 300 day statutory period. Because of this, they say, they should be able — at the very least — to contest their pay reduction in federal court.

We cannot agree. Some adverse employment actions — such as demotion to a lower position — can require more work of the employee for less pay on an ongoing basis. Other adverse employment actions can involve entirely deferred consequences — such as a delayed demotion, a deferred reduction in pay, or a notice of termination with a grace period before actual firing occurs. But whether the adverse consequences flowing from the challenged employment action hit the employee straight away or only much later, the "limitations period[] normally commence[s] when the employer's decision is made" and "communicated" to the

employee. *Ricks*, 449 U.S. at 258. Put differently, the "proper focus" is on the time that the employee has notice of "the *discriminatory acts*," not "the time at which the *consequences* of the acts became most painful." *Id*. at 258 (quotation omitted); *see also Chardon v. Fernandez*, 454 U.S. 6, 8 (1981); *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1206 (10th Cir. 2007). And in this case there is no question that the District's actions, including the planned pay reductions, were first announced to the plaintiffs in 2003 and 2004. The fact that some of those actions weren't implemented until later is immaterial.

Our conclusion in this case parallels (and is compelled by) the Supreme Court's decision in *Ricks*. The plaintiff there was a college professor whose employer denied him tenure but gave him a year to find new work. The Court held the limitations period began to run at the time the employer announced the adverse tenure decision, not when it ultimately terminated his employment a year later. The Court did so explaining that the challenged unlawful employment practice was the tenure decision and the plaintiff's eventual but deferred termination was only "a delayed . . . consequence of the denial of tenure." 449 U.S. at 257–58. And as it was in *Ricks* so it must be here. The plaintiffs before us seek to challenge (among other things) the District's decision to reduce their pay, a decision known to them well before it happened to take effect.

Shifting ground, the plaintiffs contend that, however the limitations clock used to operate under *Ricks*, the Supreme Court's decision in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) reset it. As they read *Morgan*, the § 626 limitations clock now doesn't begin running until *all* acts contributing to an adverse employment practice cease. And, the plaintiffs say, this means their claims are timely because they continued to receive paychecks reflecting the District's alleged discrimination well into 2006.

*Morgan*, however, didn't so fundamentally rework how we measure time. To be sure, *Morgan* held that *hostile work environment* claims accrue each time acts contributing to that environment occur. *See id*. at 117–18. And to be sure, this represents a deviation from the general *Ricks* accrual rule. But *Morgan* took great pains to reaffirm the *Ricks* rule and to draw only a narrow distinction for hostile work environment claims. *Morgan* began with an extended discussion endorsing *Ricks*'s rule that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire" trigger the statute of limitations when announced to the claimant, and do so whether or not all of their adverse effects or consequences are immediately felt. *Id*. at 114. *Morgan* then proceeded to distinguish hostile work environment claims from this general rule only because, unlike the mine run of employment discrimination claims, hostile work environment claims "cannot be said to occur on any particular day," and instead

usually involve a pattern of acts that aren't "actionable on [their] own" but give rise to a legal violation only when assessed in their totality. *Id*. at 115–16. By its own terms, then, *Morgan*, helps the plaintiffs in this case not at all. Mr. Almond and Mr. Weems don't seek to pursue a hostile work environment claim but wish instead to challenge the District's termination, transfer, and demotion decisions. And *Morgan* expressly held that those sorts of decisions remain subject to *Ricks*'s rule.

Before invoking the Ledbetter Act, the plaintiffs say there's still one more reason why their claims, or at least some portion of them, are timely under preexisting law. When the District announced its transfer decisions in 2003 and 2004, the plaintiffs submit, it wasn't clear about the accompanying salary reductions. As they describe the facts, the District said it would reduce their salary in two years' time only if its financial prospects didn't improve. And this temporizing about the pay cuts, the plaintiffs argue, means that their salary reductions weren't really a sure thing until 2005 and 2006 when they took effect. And because of this, they say, their administrative filings were timely at least when it comes to challenging their pay cuts.

Whatever other problems may attend this tack, a factual one surely does. Even straining to view the facts most favorably to the plaintiffs, the District in 2003 and 2004 didn't say it *might* or *could* reduce the plaintiffs' pay in the future.

It said it *would* reduce their pay in two years' time, subject only to the possibility of later review or reconsideration. And the Supreme Court has instructed us in no uncertain terms that, when a challenged employment decision is merely subject to later review, reconsideration, or appeal, this does nothing to stop the clock from running. The limitations period still accrues with the employer's announcement and "the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods . . . . [and neither does] [t]he existence of careful procedures to assure fairness." *Ricks*, 449 U.S. at 261. *See also Chardon*, 454 U.S. at 9 (Brennan, J., dissenting) (explaining that the "thrust" of the Court's jurisprudence is to require a potential plaintiff "to measure the time for filing his claim from the moment some form of injunctive relief first becomes available"); *Kessler v. Bd. of Regents*, 738 F.2d 751, 754–55 (2d Cir. 1984); 4 Lex K. Larson, *Employment Discrimination,* § 72.07[3] (2d ed. 2011).

Having concluded that the district court was right and preexisting accrual doctrine renders the plaintiffs' claims untimely, and without any suggestion from the plaintiffs that equitable tolling doctrine might save their cause, our work is still only half finished. We still have to consider whether the Ledbetter Act changes the limitations equation in any way, whether it might save the plaintiffs' otherwise lost federal claims.

The Ledbetter Act came in response to the *Ledbetter* case. Lilly Ledbetter proved at trial that her supervisors gave her poor performance reviews because of her sex — and that these reviews, in turn, caused her employer to pay her less than similarly situated male workers. *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 622 (2007). The Supreme Court, however, reversed. It explained that Ms. Ledbetter's pay discrimination claim was untimely and the jury's verdict had to be overturned because Ms. Ledbetter filed her administrative charge more than 300 days after the announcement of the employer's relevant pay-setting decision.

Writing for herself and three others, Justice Ginsburg dissented. The dissent argued that the Court should treat compensation discrimination claims like it did hostile work environment claims in *Morgan*. The dissent emphasized that, while most adverse employment actions (firings, failures to hire, demotions, transfers) are communicated or quickly made obvious to employees, compensation discrimination (or unequal pay for equal work) claims and hostile work environment claims are different. In these two situations, the dissent explained, employers don't typically announce or communicate the injurious facts to the employee. In the pay discrimination context, workers like Ms. Ledbetter of course know their own salaries but they are rarely told what their co-workers earn. And this means that an employee may have no reason to know of the fact of

- 11 -

his or her *injury* — the very existence of a pay disparity — for a long time. For this reason, Justice Ginsburg argued, pay discrimination claims shouldn't accrue when a particular pay decision is made and announced to an individual employee but should arise anew with each pay check, much as a hostile work environment claim accrues with each new act contributing to the unlawful environment. "Pay disparities [claims] are . . . significantly different from adverse actions such as 'termination, failure to promote . . . or refusal to hire,'" the dissent argued, because those cases "all involv[e] fully communicated discrete acts," while in pay discrimination claims the communication to the individual employee is usually incomplete. *Ledbetter*, 550 U.S. at 645 (quoting *Morgan*, 536 U.S. at 114).

Enter the Ledbetter Act. In addition to modifying Title VII to overturn the Supreme Court's *Ledbetter* decision, the Act added new and parallel language to the ADEA:

> [f]or purposes of this section, an unlawful practice occurs, with respect to discrimination in compensation in violation of this chapter, when a discriminatory compensation decision or other practice is adopted, when a person becomes subject to a discriminatory compensation decision or other practice, or when a person is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

29 U.S.C. § 626(d)(3).

- 12 -

The plaintiffs would have us believe this language saves their claims. In their view, an "unlawful practice" for purposes of § 626(d) occurs anytime the employer adopts a "discriminatory compensation decision or other practice." And, in their view, the "other practice" language means the alleged act of discrimination need only *relate* to compensation. Though not *all* discriminatory employment decisions involve compensation decisions or practices, the plaintiffs acknowledge many (perhaps most) do. So it is that, in their estimation, the Ledbetter Act works a near total revolution in how we measure time, with a new claim arising — and the limitations clock resetting anew — each time an employer issues a new paycheck reflecting or effecting an act of discrimination. As applied to their own case, the plaintiffs say, the District's decision to transfer the plaintiffs to lower-paid positions is the "unlawful practice" and, because that decision eventually affected their compensation, a new cause of action arises for limitations purposes each and every time they receive a smaller paycheck in their new positions.

The Ledbetter Act, however, didn't go so far. By its express terms, the Act applies only to claims alleging "discrimination in compensation" — or, put another way, claims of unequal pay for equal work. The plaintiffs before us don't seek to bring such claims and so the Ledbetter Act offers them no help. Why all this is so takes a bit of unpacking, but it is revealed by Congress's particular

choice of language in § 626(d)(3) and amply confirmed by the Act's statutory cross-references and history and by the circumstances surrounding its adoption.

The first and core difficulty with the plaintiffs' interpretation lies in the language of the Act itself. Contrary to their view, the phrase "when a discriminatory compensation decision or other practice is adopted" doesn't do the work of defining the class of discrimination cases to which the Act applies. Linguistically, the portion of the Act doing *that* task is the preceding phrase providing that "[f]or purposes of this section, an unlawful practice occurs, with respect to discrimination in compensation in violation of this chapter . . . ." It is there that Congress defined *which* "unlawful practices" are and are not affected by the Act's new accrual rules. And it is there that Congress made clear the Act's new accrual rules pertain only to "discrimination in compensation" claims "in violation of this chapter."

Neither is the phrase "discrimination in compensation in violation of this chapter" some Rorschach inkblot to which we may ascribe whatever meaning springs to mind. It is instead a clear cross-reference to a specific term of art with a settled legal meaning. "This chapter," namely the ADEA, contains a particular prohibition on compensation discrimination in § 623(a)(1). To prove such a claim, it isn't enough for an employee to show that a discriminatory practice somehow affected his or her pay. Instead, the employee must show a

- 14 -

discriminatory *pay disparity* between himself or herself and similarly situated but younger employees. *See, e.g.*, *MacPherson v. Univ. of Montevallo*, 922 F.2d 766, 774 (11th Cir.1991) (proof of "discrimination in compensation" under ADEA requires showing "similarly situated persons outside the protected age group received higher wages"); *Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 374–75 (D.C. Cir. 2010). In other words, "discrimination in compensation" requires not just *any* effect on pay, but one of a particular kind: unequal pay for equal work.

Parallel language added to Title VII underscores the point. To address the particular sex discrimination claim at issue in *Ledbetter*, the Act contains a new accrual rule for claims of "discrimination in compensation in violation of" Title VII. *See* 42 U.S.C. § 2000e-5(e)(3)(A). And like the ADEA, Title VII prohibits employers from "discriminating against any individual with respect to his compensation" because of membership in a protected class. 42 U.S.C. § 2000e-2(a)(1). We have already interpreted this prohibition to require proof of unequal pay between the employee and co-workers outside the protected class doing the same work. *See, e.g., Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1215 (10th Cir. 2010) ("To establish a prima facie case of pay discrimination, [plaintiff must] adduce evidence tending to show that she occupied a job similar to that of a higher paid male" (quotation omitted)); *see also* 1 Larson,

*Employment Discrimination,* § 13.01 (Title VII discrimination in compensation claims involve unequal pay for the same work); 1 Barbara Lindemann and Paul Grossman, *Employment Discrimination Law* § 18.I (4th ed. 2007) (similar). Of course, if there are no similarly situated co-workers, the employee may be able to make out a claim with evidence that a person outside the protected class *would have* been paid more for doing the same job. *See Washington Cnty. v. Gunther*, 452 U.S. 161, 166, 178–79 (1981). But in any case the key to a successful claim is a showing that the employer discriminatorily paid the employee too little for the position he or she occupies.

The plaintiffs' competing reading — that the Ledbetter Act applies to any "other practice" involving a discriminatory decision affecting pay — thus errs. It errs by ignoring the statute's first phrase expressly limiting the law's coverage to claims of "discrimination in compensation," as well as its clear cross-reference, "in violation of this chapter," directing us to a class of claims with a settled and statutorily precise meaning. And, in this way, the plaintiffs' proposed interpretation commits not one but two statutory interpretation sins — first by rendering a statutory phrase superfluous and then by failing to give effect to Congress's reference to a preexisting legal term with a well settled meaning. *See Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 877 (1991); *Morissette v. United States*, 342 U.S. 246, 250 (1952).

Having said that, the question remains what work *does* the second statutory phrase on which the plaintiffs seek to rely do? The answer has nothing to do with *which* claims the Act covers but with *when* those claims accrue. *After* the first phrase of the Act defines *which* claims it affects (discrimination in compensation claims), the second phrase goes on to tell us *when* those claims accrue for limitations purposes. As a matter of plain linguistic direction, the second phrase tells us compensation discrimination claims accrue for limitations purposes "*when* a discrimination in compensation decision or other practice*" is "adopted," or "*when*" someone becomes "subject to" or "affected by" its application. Of course, the word "discriminatory" must modify both "compensation decision" and "other practice" because the Supreme Court tells us that the Act doesn't permit a plaintiff to challenge a decision unless it involves unlawful discrimination. *AT&T Corp. v. Hulteen*, 129 S. Ct. 1962, 1973 (2009). But the "other practice" phrase does real and important work of its own by making clear that the accrual period for covered compensation discrimination claims is triggered not only when the pay setting decision takes place (the "discriminatory compensation decision") but *also* when other discriminatory employment practices ("other practice[s]") that result in compensation discrimination are "adopted." So it is that the first statutory phrase tells us *which* claims are covered by the Act (those alleging

- 17 -

unequal pay for equal work) and the second phrase, including the "other practice" language, tells us *when* those claims accrue for limitations purposes.

The Act's history erases any possible lingering questions. The Act's findings tell us that Congress's target was the *Ledbetter* majority and its purpose to undo the Court's treatment of "discrimination in compensation" claims. *See* Pub. L. No. 111-2 § 2, 123 Stat. 5 (2009). But while Justice Ginsburg in dissent in *Ledbetter* expressly advocated just such a statutory change, she never advocated a limitations revolution for any claim somehow touching on pay. To the contrary, Justice Ginsburg reaffirmed that hiring, firing, promotion, demotion, and transfer decisions, though often touching on pay, should and do accrue as soon as they are announced. *Ledbetter*, 550 U.S. at 649 (Ginsburg, J., dissenting). She sought to distinguish *only* compensation discrimination (or equal-pay-for-equal-work) claims from this rule. And it is hardly surprising that Congress would (and did) follow her lead.

Justice Ginsburg's dissent also helps confirm the (limited) significance of the "other practice" language. As Justice Ginsburg observed, the act of discrimination against Ms. Ledbetter wasn't in the pay-setting decision itself, but in the poor performance reviews given to her because of her gender that were later used to justify paying her less than her male colleagues. The *Ledbetter* dissent repeatedly emphasized that the pay differential, the unequal pay for equal

work, Ms. Ledbetter experienced was *caused by* these earlier discriminatory acts. *See Ledbetter*, 550 U.S. at 644 (Ginsburg, J., dissenting) (discrimination rather than performance inadequacies "accounted for the pay differential"); *see also id.* at 659 (Ledbetter's pay was "discriminatorily low due to a long series of decisions reflecting Goodyear's pervasive discrimination against women managers"). The dissent argued that the law should take account of these *other practices* when setting accrual rules for compensation discrimination claims. And it is once again hardly surprising that Congress would include language to do just that, to trigger the accrual of a compensation discrimination claim not only when employers intentionally discriminate in pay-setting decisions, but also when they discriminate in other ways that cause a discriminatory pay disparity.

Beyond language of § 626(d)(3) itself, beyond its statutory references and history, lies the realm of legislative history. And any effort to venture so far would only serve to corroborate that the "other practice" phrase doesn't covertly convert the Ledbetter Act into a Leviathan swallowing *Ricks*'s ordinary accrual rule. The House Committee Report tells us that the Act "is designed to be a narrow reversal of the *Ledbetter* decision, without upsetting any other current law." H.R. Rep. No. 110-237, at 17 (2007). The report proceeds to emphasize that the Act aims at compensation discrimination claims alone, emphasizing the unique nature of those claims and distinguishing them from other discriminatory

practices.  *See, e.g.*, *id.* at 6 ("While workers know immediately when they are fired, refused employment or denied a promotion or transfer, the secrecy and confidentiality associated with employees' salaries make pay discrimination difficult to detect."); *id.* at 7 ("Unlike hiring, firing, promotion, and demotion decisions where an individual immediately knows that she has suffered an adverse employment action, there is often no clearly adverse employment event that occurs with a discriminatory pay decision.").  And in explaining why the committee rejected an amendment that sought to strike "other practice" from the legislation, the report tells us that the phrase was necessary to ensure the bill addressed "the fact pattern in [*Ledbetter*], where sex-based performance evaluations were used in conjunction with a performance-based pay system to effectuate the discriminatory pay."  H.R. Rep. No. 110-237, at 5.  The bill's sponsor, Senator Mikulski, made plain as well that the "other practice[s]" term does *not* embrace any "discrete personnel decisions like promotions and discharges," as the plaintiffs before us imagine — and that it does not precisely because, as we have explained, the use of the preceding phrase "discrimination in compensation . . . means that [the Act] already covers only such claims — nothing more, nothing less."  155 Cong. Rec. S757 (daily ed. Jan. 22, 2009).

In light of all this, we hold that § 626(d)(3) of the Ledbetter Act governs the accrual only of discrimination in compensation (unequal pay for equal work)

claims in violation of § 623(a)(1) — nothing more, nothing less.  The language does not affect the accrual of other cases alleging discrimination in hiring, firing, demotions, transfers, or the like.  And having reached that conclusion, it follows ineluctably that the Act can't save the plaintiffs' claims in this case.  That's because there's no pay discrimination claim here.  True, the plaintiffs were transferred to lower paying positions.  True, this had the knock on effect of lowering their compensation.  True, we must assume that the transfer decision was discriminatory at this stage of the litigation.  But none of this brings the plaintiffs' claim within the ambit of the Ledbetter Act because they don't contend they were ever paid less than others doing the same work.  In fact, and though it is inessential to our decision, the plaintiffs acknowledge they were paid *more* for the first two years than their similarly situated co-workers, until their salaries were brought in line with everyone else in their pay grade.  Put differently, the plaintiffs may have been discriminated against *in the transfer decision* but they were not discriminated against *in compensation*.  Accordingly, the general *Ricks* accrual rule, not the Ledbetter Act's discrimination in compensation rule, governs this case and the plaintiffs' claims remain untimely.

Without endorsing all of the reasoning they employ, we note that the path we've taken in interpreting the Ledbetter Act generally parallels the paths taken by two of our sibling circuits, and we all reach the same result in the end.

- 21 -

*See Noel v. Boeing Co.*, 622 F.3d 266, 273–74 (3d Cir. 2010); *Schuler*, 595 F.3d at 374–75.  Our way has been made all the clearer as well thanks to the careful work of the district judge who preceded us through this statutory thicket.  The district court's judgment dismissing the case for failure to file timely administrative charges is affirmed.  Given this disposition, we have no need to reach the district court's alternative holding that Mr. Weems (but not Mr. Almond) failed to exhaust his administrative remedies for other reasons.

*Affirmed.*