In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1962

LEROY S. POULLARD,

*Plaintiff-Appellant,*

*v.*

ROBERT A. MCDONALD, Secretary,
United States Department of Veterans Affairs,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 7497 — **Joan H. Lefkow**, *Judge.*

ARGUED DECEMBER 3, 2015 — DECIDED JULY 21, 2016

Before WOOD, *Chief Judge,* and MANION and HAMILTON,
*Circuit Judges.*

HAMILTON, *Circuit Judge.* Since 2004, plaintiff Leroy
Poullard has worked at the North Chicago Veterans Affairs
Medical Center as a training specialist in the Education De-
partment. He received a promotion to the GS-11 pay grade in
2006, but since then, he has received neither a permanent pro-
motion nor a raise in his pay grade. He brought this suit

against the Secretary of the U.S. Department of Veterans Affairs alleging that this refusal to promote him or increase his salary constituted discrimination based on sex and race (Poullard is African-American). He also says that he was subjected to unlawful retaliation and a hostile work environment based on the same lack of pay and recognition, as well as a number of other incidents.

The district court granted the Secretary's motion for summary judgment, concluding that many of Poullard's claims were time-barred based on his failure to timely exhaust certain administrative remedies. On the timely claims, the court held that Poullard had not suffered an adverse employment action and that a reasonable jury could not find that the alleged harassment was sufficiently severe or pervasive to support a hostile work environment claim. We affirm. Based on the evidence Poullard has presented, we assume that he may not have been managed well or fairly. But even when viewed through a summary judgment lens, that evidence does not support a claim for unlawful discrimination, retaliation, or harassment.

I.   *Factual and Procedural Background*

   A.  *Facts Relevant to Summary Judgment*

We review the facts that follow in the light most favorable to Poullard, resolving disputes and drawing all reasonable inferences in his favor. *Liu v. Cook County*, 817 F.3d 307, 309 (7th Cir. 2016), citing *Coleman v. Donahoe*, 667 F.3d 835, 842 (7th Cir. 2012).

In 2004, plaintiff Leroy Poullard began working as a training specialist in the Education Department at what is now called the Captain James A. Lovell Federal Health Care Center

in 2004. In 2006, he received a promotion to grade GS-11. By all accounts, he performed his job well, taking on a number of managerial tasks he says were beyond his grade level and receiving very positive evaluations. In October 2006, his performance evaluation called him a "one-person Education Department." He received a number of cash awards in 2006 and 2007 to reward him for the extra work, but he did not receive a promotion. Believing that this was due to discrimination, Poullard contacted the Office of Resolution Management in May 2007 and filed a formal complaint against his then-supervisor, Marianne Semrad, alleging race and sex discrimination as well as disability discrimination and retaliation. After he filed the complaint, he received a temporary promotion to GS-12, but when it expired, he returned to the GS-11 level.

We pause here to discuss the administrative process applicable in this case, which is important to the timeliness of plaintiff's claims. Poullard is a federal employee. As a first step in resolving his claims of unlawful discrimination, he was required to try to resolve the matter informally by consulting an Equal Employment Opportunity counselor. 29 C.F.R. § 1614.105(a). The regulations require an employee to initiate contact with the counselor within 45 days of the allegedly discriminatory matter. § 1614.105(a)(1). If informal counseling fails, the employee must then file a formal complaint. See § 1614.106. Then, if the employee wishes to file a civil action, he may do so either within 90 days of receiving notice of the agency decision or, if he chooses to appeal to the Equal Employment Opportunity Commission, within 90 days of the EEOC's resolution of his appeal. 42 U.S.C. § 2000e-16(c). With respect to the 2007 complaint of discrimination, Poullard both

contacted a counselor and filed a timely formal complaint. After a final agency decision against him, he did not file an action in federal court.

Meanwhile, in October 2007, a number of staffing changes took place in the Education Department. Semrad left her position as associate director for facility support, and Mary Ann Cardinali took over that role. In November 2007, Richard Holt became the acting chief of the Education Department, and in July 2008, Dr. Norma Mailand replaced Holt and became the assistant department head for education and training, a GS-13 position. These transitions left Mailand as Poullard's direct supervisor and Cardinali as his second-line supervisor.

Poullard did not apply for the supervisory position that Mailand eventually received. He did not satisfy the time-in-grade prerequisite of one year in service at the GS-12 grade. According to Poullard, however, after Mailand's appointment he continued to perform the extra managerial duties for which he had previously been responsible, including preparing the annual budget and drafting the department's strategic plans. Despite the extra work, his classification and compensation remained at the GS-11 level.

Poullard repeatedly questioned the department's refusal to compensate him for the duties that were beyond his grade classification, though it is undisputed that he never actually applied for another promotion. On February 26, 2010, and again on March 24, 2010, Poullard sent Mailand e-mails itemizing his assigned tasks that he believed were above his grade level. Mailand directed a VA classification specialist to evaluate those tasks. The classification specialist concluded that the tasks were appropriate for a GS-11 employee, and Poullard

did not receive a reclassification or increased pay. Poullard does not claim that this decision was discriminatory.[1]

While the dispute about Poullard's classification and pay was ongoing, other incidents relevant to his claims occurred. In October 2008, Cardinali held a meeting of department employees. At one point, she ordered that the tape recorder in the room be turned off and said, "I know people in Washington, D.C. and if you file a complaint, they are going to send it back to me and I'm going to deal with you." She also said that management intended to "get the monkeys off their back[s]" and threw a toy monkey at Poullard, apparently in reference to a Harvard Business Review article entitled "Management Time: Who's Got the Monkey?" In a separate incident, Mailand referred to Poullard as a "sugar daddy." On a different occasion, after viewing an older photograph of Poullard taken when he had had an afro hairstyle, Mailand said that he was a "better person" than he had been before.

On March 5, 2010, Poullard contacted the Office of Resolution Management and reported that he had been forced to perform managerial duties and responsibilities beyond his GS-11 grade level. On April 17, he filed a timely formal complaint. He claimed that Mailand had discriminated against him by ensuring he had more assignments than other training

---

[1] In a desk audit, an employee's duties and responsibilities are assessed "to determine whether, 'due to the accretion of additional duties and responsibilities,' his position should be 'reclassified at a higher grade.'" *Poullard v. Shinseki*, No. 12 C 7497, 2015 WL 1428105, at *2 (N.D. Ill. Mar. 26, 2015). It is not clear why the VA classification specialist's assessment of Poullard's duties does not qualify as a desk audit, but the parties agree that Poullard's 2010 request for a desk audit was denied.

specialists and forcing him to perform above-grade tasks without compensation or recognition. He also alleged he had been subjected to a hostile work environment and retaliation, pointing to the following incidents in addition to the uncompensated extra assignments and above-grade tasks:

- The meeting in which Cardinali referred to employees as monkeys;

- The incident in which Mailand called Poullard a sugar daddy;

- A letter of admonishment he received on January 27, 2009, for failing to follow the chain of command when he asked to meet with Holt about being required to perform Mailand's duties;

- Denial of overtime compensation for extra hours in October 2009;

- The incident in which Mailand said that Poullard was a "better person" than he had been;

- A performance review for fiscal year 2009, in which Poullard received a "Fully Successful" rating (he believed he should have received a higher rating based on the extra duties he performed);

- An incident on February 26, 2010 in which, after Poullard requested a meeting with management to discuss alleged discrimination, Mailand began to "harass" him by "demanding documents and setting strict work deadlines";

- Mailand's refusal to recognize additional hours that Poullard worked on a monthly basis from October 2009 onward; and

- Mailand's repeated threats of disciplinary action in response to Poullard's questions about performing her duties.

In July 2012, the Office of Employment Discrimination Complaint Adjudication for the VA found that Poullard had failed to prove discrimination. Poullard did not appeal to the EEOC but instead filed this civil action in district court on September 19, 2012, alleging race and sex discrimination, hostile work environment, and retaliation.

B.  *District Court Proceedings*

The Secretary moved for summary judgment, and the district court granted the motion. *Poullard v. Shinseki*, No. 12 C 7497, 2015 WL 1428105 (N.D. Ill. Mar. 26, 2015). Judge Lefkow held that all claims arising from events addressed in Poullard's first formal complaint were time-barred by his failure to file a civil action after receiving a final decision from the EEOC on March 26, 2010. *Id.* at *5. She also held that all alleged acts of discrimination that occurred before January 19, 2010 (45 days before Poullard contacted a counselor on March 5, 2010) were time-barred. *Id.*

Poullard argued that at least some of his claims were rendered timely by the Lilly Ledbetter Fair Pay Act of 2009, which provides that an "unlawful employment practice" occurs each time a person is paid pursuant to a discriminatory compensation decision or practice. 42 U.S.C. § 2000e-5(e)(3)(A). It further allows an aggrieved person to recover back pay for up to two years preceding a charge's filing "where the unlawful employment practices that have occurred during the charge filing period are similar or related

to unlawful employment practices with regard to discrimination in compensation that occurred outside the time for filing a charge." *Id.* at § 2000e-5(e)(3)(B). Poullard argued he could assert a discrimination claim based on disparate pay extending back two years before he filed the charge.

The district court rejected Poullard's attempt to frame his claim as a challenge to a discriminatory compensation practice, holding that the "gravamen" of the claim was failure to reclassify him at a higher grade level—in essence, for failure to promote. *Poullard*, 2015 WL 1428105, at *6. Noting that several courts have held that a decision regarding promotion does not qualify as a "compensation decision," the court found that the Fair Pay Act did not save his core claims. *Id.* at *6–7.

This left Poullard with significantly fewer viable claims. His core disparate treatment claims were limited to only acts after the cutoff date of January 19, 2010. The district court determined that none of the events after January 19 constituted an adverse employment action and granted summary judgment to the Secretary on that basis. *Id.* at *9. The court likewise held that Poullard had not identified an adverse employment action upon which to base his retaliation claims. *Id.* at *9–10. Finally, the district court found that the Secretary was entitled to judgment as a matter of law on the hostile work environment claim, holding that Poullard's evidence did not show that his work environment was permeated with harassment "so severe and [*sic*, should be 'or'] pervasive" as to alter his conditions of employment. *Id.* at *11.

II.  *Analysis*

We review *de novo* the grant of summary judgment to the
Secretary, resolving all factual disputes and drawing all rea-
sonable inferences in Poullard's favor, as mentioned above.
*Liu*, 817 F.3d at 309. Summary judgment is appropriate when
there is no genuine dispute of material fact and the moving
party is entitled to judgment as a matter of law. Fed. R. Civ. P.
56(a). We first address Poullard's core disparate treatment
claims of race discrimination and then turn to his retaliation
and hostile work environment claims.[2]

A.  *Disparate Treatment*

As the district court held, many of Poullard's claims of dis-
parate treatment fail because they arose outside the applica-
ble limitations periods. On appeal, Poullard does not chal-
lenge the district court's conclusion that any disparate treat-
ment claims based on events occurring before January 19,
2010, 45 days before he contacted a counselor, are time-
barred. See *Lapka v. Chertoff*, 517 F.3d 974, 981 (7th Cir. 2008)

---

[2] Poullard has failed to preserve his claims for sex discrimination on ap-
peal. He did not separately address the sex discrimination theory or point
to any evidence suggesting animus on the basis of sex, and as the govern-
ment points out, Poullard in fact testified that he did not believe the per-
ceived discrimination was due to his sex. Poullard's briefs refer to
"race/sex" discrimination in tandem with one another, suggesting he did
not intend to give up the theory, but that is not enough to preserve his
claims on appeal. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012)
(arguments may be waived on appeal "if they are underdeveloped, con-
clusory, or unsupported by law"). In any event, his sex discrimination
claims are no stronger than his claims for race discrimination, which fail
for reasons explained below.

(because counseling requirement serves an important function by giving agencies a chance to resolve a complaint informally, "we bar claims if the forty-five day requirement is not satisfied and there is no occasion for equitable tolling"). Nor does he challenge the conclusion that his failure to bring suit within 90 days of the resolution of his first administrative complaint bars any claims based on those events. See 42 U.S.C. § 2000e-16(c).

Poullard seeks to save his claim that he was forced to perform work above his grade level without commensurate pay and recognition. As noted above, the district court characterized that claim as a failure-to-promote claim and rejected it because the record contains no evidence that Poullard applied for a promotion after the cutoff date of January 19, 2010, or that a promotion for which he had previously applied was denied after that date. Poullard argues that this was error and that the claim actually challenges a discriminatory compensation decision.

How to characterize Poullard's claim has practical consequences. We need not repeat the well-known history of the Lilly Ledbetter Fair Pay Act of 2009, Pub. L. 111-2, 123 Stat. 5. See *Groesch v. City of Springfield*, 635 F.3d 1020, 1024 (7th Cir. 2011). Under the Fair Pay Act, an unlawful employment practice occurs not only when a discriminatory compensation decision or other practice is first adopted or when an individual first becomes subject to that decision or practice, but also "when an individual is *affected* by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice." 42 U.S.C. § 2000e-5(e)(3)(A) (emphasis added). If the Fair Pay Act

applies to Poullard's claim, it is timely if at least one unlawful employment practice—including the receipt of a single paycheck—occurred during the 45 days preceding his consultation with the counselor. Furthermore, under 42 U.S.C. § 2000e-5(e)(3)(B), Poullard could recover up to two years of back pay so long as the unlawful practice occurring during the charge filing period is "similar or related to" the unlawful compensation practices that occurred outside that period.

This is a new question for us. Other circuits have held that what qualifies as a "discriminatory compensation decision or other practice" within the meaning of the Fair Pay Act is necessarily limited. E.g., *Daniels v. United Parcel Service, Inc.*, 701 F.3d 620, 630 (10th Cir. 2012) (Fair Pay Act "did not create a 'limitations revolution for any claim somehow touching on pay'"), quoting *Almond v. Unified School District No. 501*, 665 F.3d 1174, 1182 (10th Cir. 2011); *Noel v. Boeing Co.*, 622 F.3d 266, 275 (3d Cir. 2010) ("We recognize that many employment-related decisions, not simply pay-setting decisions, ultimately have some effect on compensation. But to include these myriad employment decisions within the 'other practice' language of the [Fair Pay Act] would weaken Title VII's administrative exhaustion requirement."); *Schuler v. Pricewaterhouse-Coopers, LLP*, 595 F.3d 370, 375 (D.C. Cir. 2010) (background of the Fair Pay Act "strongly suggests the statute is directed at the specific type of discrimination involved in [*Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007)] and not to other unspecified types of discrimination in employment"). More specifically, cases like *Daniels*, *Noel*, and *Schuler* tie the effects of the Fair Pay Act to a very specific type of claim: that the employer is "paying different wages or providing different benefits to similarly situated employees." *Daniels*, 701 F.3d

at 630–31, quoting *Schuler*, 595 F.3d at 374; see also *Noel*, 622 F.3d at 273–74.

Poullard agrees that a pure failure-to-promote claim would not fall into the ambit of the Fair Pay Act. He also concedes that he did not apply for a promotion after January 19, 2010, so if his claim is for failure to promote, it is, as the district court held, untimely. See *Hill v. Potter*, 625 F.3d 998, 1003 (7th Cir. 2010) (failure to promote can be adverse action, "but the plaintiff must first show that she properly applied for the position"). We must decide whether Poullard's claim is in fact a disparate-pay claim, as he contends.

Citing *Almond*, Poullard argues that the key to a successful claim for pay disparity "is a showing that the employer discriminatorily paid the employee too little for the position he or she occupies." 665 F.3d at 1181. That, Poullard argues, has always been his complaint: Mailand was paid at the GS-13 level, while he was paid at the GS-11 level for doing Mailand's managerial work. Poullard points to various places in his EEO complaint alleging that he was forced to perform tasks unrelated to his training specialist position "without proper compensation," "without compensation/recognition," and so on. His complaint in the district court also alleges that the department's "failure to fairly compensate plaintiff for the actual work duties he performed" constituted a continuing violation of Title VII, and his memorandum in opposition to summary judgment characterized his claim as one for disparate pay, at least in part.

On the other hand, some of Poullard's allegations point to a failure-to-promote claim instead. He alleged in his complaint that similarly situated employees were "routinely

granted desk audits, competitive promotion and advancement when compelled to perform duties and responsibilities beyond their grade level." And in the summary judgment briefing, he contended he was entitled not only to back pay as a remedy but also "to permanent placement as a GS-13 retroactive to 2008," citing a failure-to-promote case from the Fourth Circuit in support.

We are inclined to give Poullard the benefit of the doubt on this question. As the plaintiff, he was free to frame his complaint as he chose, and though he could have been clearer, we see no reason he could not have at least tried to bring a pay-disparity claim instead of, or in addition to, a failure-to-promote claim. The problem is that even if we treat this as a pay-disparity case and thus give Poullard the benefit of the Fair Pay Act's extended limitations period, he has not presented enough evidence to survive summary judgment.

Whether a plaintiff uses the direct, indirect, or "convincing mosaic" methods of proof, the fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination. See *Bass v. Joliet Public School District No. 86*, 746 F.3d 835, 840 (7th Cir. 2014). To meet his burden, Poullard relies on the so-called indirect method of proof adapted from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that method, he must first offer evidence of a prima facie case of disparate treatment, which requires evidence that: (1) he was a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action (i.e., unequal pay); and (4) the employer treated a similarly situated person outside the protected class more favorably. See *Cullen v. Indiana University Board of Trustees*, 338 F.3d 693, 703–

04 (7th Cir. 2003). In the disparate-pay context, this inquiry boils down to a showing of equal work for unequal pay, with the protected class as the distinguishing factor. E.g., *Daniels*, 701 F.3d at 630–31; *Schuler*, 595 F.3d at 374.

Poullard's case falters at step four of the prima facie case, identifying a similarly situated employee who was treated better. In the district court, Poullard argued that he had identified two similarly situated training specialists who were paid the same as he was, at the GS-11 level, but were not assigned extra managerial tasks—in essence, an argument of equal pay for unequal work, rather than unequal pay for equal work. He has not renewed this argument on appeal. Instead, he argues for the first time that Mailand, his direct supervisor from 2008 onward, is an appropriate comparator for his prima facie case.

It is well established that arguments not presented to the district court are waived on appeal. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012). Poullard did not preserve the argument that Mailand was an appropriate comparator simply because his district court brief mentioned her. He did not identify her as a comparator or argue that she was similarly situated. See *Fleishman v. Continental Casualty Co.*, 698 F.3d 598, 608 (7th Cir. 2012) (the "waiver doctrine charges litigants with raising the arguments they present on appeal in the district court, not just the facts on which their appellate arguments will rely").

Even if Poullard had previously identified Mailand as a potential comparator, the argument fails on the merits. The similarly-situated inquiry is a flexible one, but we frequently consider whether the employees in question had the same job description, were subject to the same standards, had the same

supervisor, and had comparable experience, education, and other qualifications. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007), citing *Bio v. Federal Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005). On summary judgment, we must accept as true Poullard's evidence that he performed a number of managerial duties that ought to have been done by Mailand, but that fact is not enough to make Poullard and Mailand sufficiently comparable "in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Mailand was Poullard's supervisor, for one thing. This fact alone makes it difficult to conclude that two employees are similarly situated. *Id.*; see also *Cullen*, 338 F.3d at 700 (difference in number of supervisees was factor showing positions were dissimilar). On this record, there is also no dispute that Poullard did not satisfy the time-in-grade requirement—a year at the GS-12 level—for the position Mailand held. This difference in experience further undermines Poullard's (late) attempt to use Mailand as a comparator. The evidence that Mailand delegated many managerial duties to Poullard is not enough to render her comparable to him in all material respects, at least not given the rest of the record in this case. Poullard's claim for disparate pay fails on this basis.

Poullard does not seek to revive any other disparate treatment claims on appeal, and we agree that, due primarily to the timing problems, no other such claims appear viable. A successful disparate treatment claim requires some materially adverse employment action. *Nichols v. Southern Illinois University–Edwardsville*, 510 F.3d 772, 779 (7th Cir. 2007). Most of the arguably adverse events Poullard identifies occurred outside the 45-day window that preceded his contact with the counselor. Poullard was refused a desk audit in February and March 2010, but he does not argue that those refusals were

discriminatory, or that the denial of a desk audit alone (as opposed to the denial of the accretion-of-duties promotion that a successful desk audit might yield) amounted to a materially adverse employment action. In fact, Poullard stated explicitly in his opening brief that he "does not allege the Agency discriminated against him by denying him an 'accretion-of-duties' promotion." The district court correctly granted the Secretary summary judgment on Poullard's disparate treatment claims.

B. *Retaliation*

Poullard also contends that his employer retaliated against him for trying to exercise his rights under Title VII. See 42 U.S.C. § 2000e-3(a). As with disparate-treatment claims, a plaintiff may prove a retaliation claim through either the direct or indirect methods of proof, though in recent years we have questioned the value of the formal distinction between those methods. See *Castro v. DeVry University, Inc.*, 786 F.3d 559, 564 (7th Cir. 2015) (collecting cases). Under the direct method of proof, Poullard must show that: (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the two. *Id.* Under the indirect method, he must first show two of the same elements required by the direct method: protected activity and an adverse employment action. *Silverman v. Board of Education*, 637 F.3d 729, 742 (7th Cir. 2011). To complete his prima facie case and move on to the issue of pretext, he would also need to offer evidence that he met the department's legitimate expectations and that he was treated less favorably than similarly situated employees who did not engage in protected activity. *Id.* Under either method, the core question is the

same: "could a reasonable trier of fact infer retaliation?" *Castro*, 786 F.3d at 564.

Poullard engaged in protected activity when he filed his 2007 EEO complaint. The Secretary argues that Poullard has not offered evidence of a materially adverse action. In the retaliation context, the challenged adverse action need not be one that affects the terms and conditions of employment, but it "must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Roney v. Illinois Dep't of Transportation*, 474 F.3d 455, 461 (7th Cir. 2007), citing *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 62–65, 68 (2006).

Poullard contends that several events qualify as adverse actions under this standard: (1) Cardinali's threatening statement during the October 2008 staff meeting; (2) Mailand's threat of disciplinary action when he continued to question her about performing her duties; (3) a letter of admonishment in 2009 when he complained of being forced to perform Mailand's managerial duties; (4) racially offensive conduct by Mailand and Cardinali; and (5) Poullard's continued performance of Mailand's duties without proper compensation. We address these points in turn.

First, Cardinali's and Mailand's threats of unspecified disciplinary action do not constitute adverse actions, at least not in this context. "Federal law protects an employee only from retaliation that produces an injury," *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009), and by themselves, these threats did not. They had no effect on Poullard's compensation or career prospects. While we do not doubt that the possibility of discipline can be stressful, we have previously held that this

kind of threat is not enough to support a claim for retaliation. See *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009) ("a suspension without pay that is never served does not constitute an adverse employment action" for retaliation purposes), quoting *Whittaker v. Northern Illinois University*, 424 F.3d 640, 647 (7th Cir. 2005); *Ajayi v. Aramark Business Services, Inc.*, 336 F.3d 520, 531 (7th Cir. 2003) (disparate impact claim; no adverse employment action where employee was informed of impending demotion but never actually demoted); see also *Dunn v. Washington County Hospital*, 429 F.3d 689, 692–93 (7th Cir. 2005) ("dark hints of future adverse employment action" were not themselves adverse employment actions for Title VII retaliation purposes). Poullard suggests that the 2009 letter of admonishment he received is proof that harm flowed from the threats, but he does not explain what effect if any that letter had on his compensation, career prospects, or conditions of employment.[3]

---

[3] Our cases on unfulfilled threats have not always appeared consistent. For example, we have left open "the possibility that a plaintiff could argue that a singular threat of termination had the impact of dissuading a reasonable worker from supporting a discrimination complaint." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 681 n.2 (7th Cir. 2010); cf. *Dunn*, 429 F.3d at 692 ("Talk is cheap; unless Dunn knew that Coy had sabotaged the career of other nurses, his statements would not have dissuaded reasonable persons from protecting their own rights under the statute and thus cannot violate Title VII."). We think this is simply a reflection of the Supreme Court's instruction that "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Burlington Northern*, 548 U.S. at 69. Here, Poullard does not explain why the unfulfilled threats of discipline he received were significant enough in context to rise to the level of a materially adverse action, and we see no basis for that conclusion in the record.

Admittedly, there is a tension between this outcome and the purposes underlying Title VII retaliation claims. "The antiretaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms." *Burlington Northern*, 548 U.S. at 68, quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997). If an employer threatens an employee with discipline based on her previous protected activity and thereby deters her from using those mechanisms, the purpose of Title VII's anti-retaliation provision has been frustrated—but because the unfulfilled threat may not itself be actionable, the employer suffers no consequences. On the other hand, the anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67. We do not doubt that threats of future discipline can cause stress or worry, but so too can "petty slights or minor annoyances that often take place at work and that all employees experience," which the Supreme Court has excluded from the bounds of materially adverse actions. *Id.* at 68.

We must emphasize, however, that an unfulfilled threat of discipline for protected activity, if not actionable itself, may well be relevant evidence of retaliatory intent behind a more concrete adverse action. See, e.g., *Volovsek v. Wisconsin Dep't of Agriculture, Trade and Consumer Protection*, 344 F.3d 680, 688 (7th Cir. 2003) (pre-*Burlington Northern*; supervisors' discussion of how to "get rid of" an employee was not adverse action for retaliation purposes but could be relevant to motive). For example, if Poullard had been threatened with discipline if he filed another complaint, had done so anyway, and were later disciplined, the threat could be evidence of retaliatory intent and thus a causal connection. Likewise, if an employer

offered a legitimate, non-discriminatory reason for the discipline, the earlier threats might serve as evidence of pretext. That is not this case, however. Poullard does not seek to use the threats to show cause or pretext with respect to a different adverse action. The threats themselves were not materially adverse actions, so Poullard's retaliation theory based on the threats of discipline fails.

The alleged racially offensive conduct is a somewhat different matter. Harassment can constitute a materially adverse action for retaliation purposes, but as we have said, "not everything that makes an employee unhappy is an actionable adverse action." *Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014) (citation and quotation marks omitted); see also *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 466 (7th Cir. 2002) (harassment must be serious enough to be "actionable" to constitute materially adverse action). The question is still whether the racially offensive conduct Poullard alleges is serious enough to dissuade a reasonable employee from engaging in protected activity.

Only three incidents Poullard described have even a tenuously arguable connection to race: (1) the meeting in October 2008, when Cardinali threw a toy monkey at Poullard and said that management intended to "get the monkeys off the backs of management"; (2) the incident in October 2008 when Mailand referred to Poullard as a "sugar daddy"; and (3) Mailand's comment in November 2009 that Poullard was a "better person" than before, apparently with reference to an older photograph in which Poullard had an afro hairstyle. On the spectrum of offensive conduct, these statements fall at best on the less severe end. Cf. *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) ("an unambiguously racial epithet

falls on the 'more severe' end of the spectrum"), citing *Rodgers v. Western-Southern Life Insurance Co.*, 12 F.3d 668, 675 (7th Cir. 1993). The first remark in particular, which could be very troubling out of context, actually referred to a well-known Harvard Business Review article about the value of delegation, entitled "Management Time: Who's Got the Monkey?" See William Oncken, Jr. & Donald L. Wass, *Management Time: Who's Got the Monkey?*, Harvard Business Review, Nov.–Dec. 1999, *available at* https://hbr.org/1999/11/management-time-whos-got-the-monkey (describing article as "one of the publication's two best-selling reprints ever"). The other two remarks were at worst mild and ambiguous. They do not support a reasonable inference of discriminatory animus, nor are they overtly hostile in any objective sense.

The alleged harassment was also not "an incessant part of the workplace environment," *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). Poullard points to just three questionable incidents over fourteen months. We do not mean to minimize the negative effects Poullard says these incidents had on his life. But the test is an objective one. On this record, no reasonable jury could find the alleged harassing conduct was severe enough to dissuade a reasonable employee from exercising his Title VII rights. It was not actionable retaliation. *Hilt-Dyson*, 282 F.3d at 463, 465–66 (though employee considered incidents demeaning and degrading, conduct was not severe enough to constitute actionable harassment and could not support claim for retaliation); see also *Burlington Northern*, 548 U.S. at 68–69 (standard for judging harm in Title VII retaliation context must be objective).

Finally, Poullard argues that the failure to compensate him at a higher level for the work he was performing was a materially adverse action and that his continued GS-11 classification has disadvantaged him in applications for jobs both inside and outside the department. The denial of a promotion can be an adverse action for purposes of a retaliation claim. *Malin v. Hospira, Inc.*, 762 F.3d 552, 558 (7th Cir. 2014); *Volovsek*, 344 F.3d at 688. But as Poullard concedes, he never sought a promotion. He requested a desk audit in 2010, which was denied, but Mailand testified that she had Poullard's concerns evaluated by a classification specialist, who reported that in his opinion Poullard's classification was appropriate so he did not receive the audit.[4]

These facts hint at the basic problem with Poullard's pay-discrimination theory of retaliation. Both before and after his protected activity, the conditions of his employment remained exactly the same. His classification and pay remained GS-11, and he continued to be responsible for managerial duties that he believed were beyond his grade. His theory that the pay disparity was a "continuing form of retaliation" is nothing more than his discrimination claim recast. It is a poor fit when, as far as this record shows, the administrative complaints Poullard filed changed nothing about the compensation-related terms and conditions of his employment in the

---

[4] This evidence is admissible for its effect on Mailand, whose state of mind is relevant, though not for the truth of the specialist's statement that Poullard's classification was actually appropriate. See Fed. R. Evid. 801(c)(2); *Cooper-Schut v. Visteon Automotive Systems*, 361 F.3d 421, 430 (7th Cir. 2004) (testimony as to what plaintiff had been told by another employee was properly treated as hearsay and admitted only "for the effect that it had on its listener.").

department. Nor has he presented anything more than spec-
ulation that the refusal to increase his pay was due to his pro-
tected activity. There is no suspicious timing—there is no "ac-
tion," only a pattern of inaction that began before he filed his
complaint and continued afterward. There are no suspicious
remarks connecting the department's pay decisions to
Poullard's complaint, and Poullard has pointed to no similarly
situated comparators who received a pay raise or a desk audit
and did not engage in protected activity. On this record, a rea-
sonable trier of fact could not infer that the refusal to pay
Poullard at a GS-13 level was retaliatory. *Castro*, 786 F.3d at
564. The district court properly granted summary judgment
to the defendant on the retaliation claims.

C. *Hostile Work Environment*

Finally, Poullard argues that he was subjected to a racially
hostile work environment. To survive summary judgment on
this claim, Poullard must present evidence sufficient for a rea-
sonable jury to find that (1) the environment was both subjec-
tively and objectively offensive; (2) the harassment he suf-
fered was based on his membership in a protected class; (3)
the conduct was severe or pervasive; and (4) there is a basis
for employer liability. *Alexander v. Casino Queen, Inc.*, 739 F.3d
972, 982 (7th Cir. 2014), quoting *Mendenhall v. Mueller Stream-
line Co.*, 419 F.3d 686, 691 (7th Cir. 2005).

We have explained above why the three arguably race-
tinged remarks did not rise to the level of severe or pervasive
conduct. Poullard asks us to consider those remarks in com-
bination with all the other conduct of which he complains—
the pay disparity, the letter of admonishment, the threat from

Cardinali that she "knew people in Washington," and so on.[5] But even taking those additional facts into account, we agree with the district court that Poullard has not shown that the alleged harassment was severe or pervasive enough to rise to the level of a hostile work environment. Cf. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) (employee's complaints "about transfers, a late overtime payment, his salary, and difficulties with managers" were "normal workplace friction," not harassment); *Patton v. Indianapolis Public School Board*, 276 F.3d 334, 339 (7th Cir. 2002) (no hostile work environment claim where employee alleged that her supervisor "treated her in a rude, abrupt, and arrogant manner, ignored her work-related suggestions and failed to keep her informed about changes at work").

The judgment of the district court is AFFIRMED.

---

[5] We can consider events outside the Title VII filing period for purposes of a hostile work environment claim, so long as "an act contributing to the claim occurs within the filing period." *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002); see also *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 684–85 (7th Cir. 2010) (applying *Morgan*'s continuing violation doctrine to hostile work environment claim).