In the

# United States Court of Appeals
## For the Seventh Circuit

No. 16-1959

JEFF MONROE,

*Plaintiff-Appellant,*

*v.*

INDIANA DEPARTMENT
OF TRANSPORTATION and JOE
MCGUINNESS,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:14-cv-00252 — **Sarah Evans Barker**, *Judge.*

ARGUED NOVEMBER 7, 2016 — DECIDED SEPTEMBER 18, 2017

Before EASTERBROOK and WILLIAMS, *Circuit Judges* and
FEINERMAN, *District Judge.*[*]

---

[*] Of the Northern District of Illinois, sitting by designation.

WILLIAMS, *Circuit Judge*. Jeff Monroe worked for the Indiana Department of Transportation ("INDOT") for just over twenty-one years. In January 2013, after seven or eight of Monroe's subordinates went to Monroe's supervisor, Terry George, to complain about Monroe's treatment of them, INDOT conducted an investigation of Monroe's conduct. During the investigation, Monroe disclosed that recently he had been diagnosed with Post Traumatic Stress Disorder ("PTSD"). After completing the investigation, INDOT discharged Monroe for creating a hostile and intimidating work environment. Monroe then sued INDOT and its Commissioner[1] alleging various claims, including that he was terminated "on the basis of" or "solely because of" his mental disability in violation of the Americans With Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act. The district court granted defendants' motion for summary judgment. Monroe now appeals, claiming that he provided sufficient evidence that INDOT's proffered reason for discharging him was pretextual and that INDOT treated similarly situated non-disabled employees more favorably than they treated him. Because we find there is not a genuine issue of material fact regarding either of Monroe's contentions, we affirm the district court.

---

[1] The Commissioner of INDOT has changed during the pendency of Monroe's case. On January 12, 2017, Commissioner Joe McGuinness, was substituted as a Defendant-Appellee. We will refer to both McGuinness and INDOT as either "defendants" or "INDOT."

## I. BACKGROUND

Monroe began working for INDOT on January 6, 1992 and continued his employment until he was terminated on February 4, 2013. The last position Monroe held with INDOT was unit foreman on the night shift, from 8 p.m. until 6 a.m. Monroe supervised fourteen regular employees and four seasonal employees. As part of his job, Monroe had the difficult task of helping to clean up human remains after traffic accidents. He also witnessed a co-worker die after a work-related accident.

Monroe faced challenging circumstances outside of his work for INDOT as well. He had served in combat in the Gulf War. In late 2012 Monroe's sister, who had lived with him, died of cancer. While employed at INDOT, Monroe also worked a second job as a stagehand. He testified that near the end of his employment with INDOT, he was not sleeping well and had become irritable and easily upset.

In December 2012, Monroe spoke with his supervisor George and told him that he was stressed, burned out, could not sleep, and that he wanted to be transferred to a day shift position. In January 2013, after George did not get back to him, Monroe met with George and George's supervisor, J.D. Brooks. Monroe again requested to be transferred to the day shift, but was told that no position was available.

On January 7, 2013, George completed a performance review for Monroe in which he gave Monroe an overall performance rating of "Exceeds Expectations" for 2012. Monroe had received the same rating from other supervisors for 2010 and 2011 as well.

### A. January 24, 2013 Incident

On the evening of January 24, 2013, Monroe arrived for his usual 8 p.m. to 6 a.m. shift. During a safety briefing, Monroe informed his subordinates that some of them would have to go to another unit to help prepare some equipment for a predicted overnight snowfall. According to Monroe, crew members Johnny Perkins and Josh McClung objected and complained about doing other peoples' work. Perkins told Monroe he did not respect the crew and Monroe responded that respect had to be earned. Monroe then dropped his clipboard on the desk, said, "f*** this," and told his crew leader Danny Wise to take over.

Monroe went into his office to calm down and then asked Perkins to meet him in the wash bay, which was an area with more privacy. Monroe contends that Perkins tried to fight him in the wash bay but that he would not fight and instead told Perkins to come to his house so they could discuss why Perkins wanted to fight all the time.

The next day, January 25, after they had completed their shift, seven or eight of Monroe's subordinates went to speak to George about Monroe's treatment of them. When George heard the nature of the employees' complaints, he called in his supervisor, J.D. Brooks. Brooks in turn called in Jeff Neuman, Human Resources Manager of the Greenfield District, to listen to the employees' concerns. The employees stated that Monroe screamed at them, treated them with no respect, threatened to terminate them, and publicly ridiculed one employee who had a hearing impairment. After listening to the employees' statements, it was decided that Neuman would conduct an investigation into their complaints.

### B. Investigation of Complaints Against Monroe

On Sunday, January 27, 2013, George called Monroe at home to let him know that some complaints had been made and that he needed to attend a meeting in George's office the next day. During the conversation, Monroe told George that he had been given a preliminary diagnosis of PTSD.[2]

On January 28, Monroe met with George, Brooks, and Neuman, although George left soon after the meeting began. Monroe was told that an investigation of complaints made about him would be conducted. He was offered the choice of either taking vacation or moving to a different location during the investigation. Monroe chose to take vacation. During the meeting, Monroe told Brooks and Neuman that he had spoken to a therapist who believed he had PTSD.

Also on January 28, seven of the original employees who met with George, Brooks, and Neuman on January 25 each gave written statements about Monroe. Several said that at the January 24 safety briefing Monroe had cursed at the crew, called them names, yelled, and threatened to fight Perkins. Several also said that Monroe's yelling, threatening to fire employees, and belittling employees had been going on for quite some time. Edward (Eddie) Sellers, the employee with a hearing impairment, said that Monroe made him feel bad for asking Monroe to repeat an assignment when Sellers did not hear

---

[2] Although Monroe did not actually meet with a therapist for the first time until January 29, 2013, he testified at his deposition that in speaking with people over the phone to make an appointment for therapy, he was told that it sounded like he had PTSD and depression.

him initially, that Monroe told him he should wear a "bell-tone" referring to Sellers' "lack of hearing," and that Monroe disciplined him like a child.

On January 29, Monroe was interviewed about the allegations made against him. Monroe stated he had PTSD and depression that affected his sleep. He said not getting sleep caused him to get frustrated easily, although he denied using profanity or blowing up on January 24. He said, "I don't handle Eddie [Sellers] like I should – [I] talk[] real slow to him."

As the investigation continued, a number of other employees and former employees were also interviewed regarding their experiences with Monroe. The eleven current crew members reporting to Monroe that had not already given written statements were interviewed and only three had primarily positive things to say about him. The rest had either mixed or mostly negative comments including that Monroe was testy, intimidating, volatile, demeaning, militaristic, and disrespectful. Some also reported that Monroe threatened their jobs and that he made fun of Sellers. Eight former employees were also interviewed. A few said they never had a problem with Monroe, but others said working for Monroe was stressful, that he would have outbursts and be demeaning, and that he used military methods to get the work done.

When the investigation was completed, Neuman, Brooks, George, and Brandye Hendrickson, who was then District Deputy Commissioner, met to discuss what action to take. According to Neuman, they believed "it wasn't clear whether the diagnosis [of PTSD] was legitimate or not …" because Monroe obtained the diagnosis right after a number of employees had complained about him and because Monroe did not produce documentation or even explain where he had

gotten the diagnosis. The attendees at the meeting unanimously agreed that Monroe should be terminated. Monroe was discharged on February 4, 2013 for "consistently exhibit[ing] hostile and intimidating behavior in the execution of [his] responsibilities to the employees … assigned to [his] supervision."

### C. INDOT'S Treatment of Other Employees

Monroe identified three INDOT employees who also had instances of inappropriate conduct and were not fired. Monroe testified that in 2009 or 2010 an employee named Jim Patrick supervised five unit foremen, including Monroe. Monroe stated that four of the five unit foremen complained that Patrick was belittling and undermining his subordinates. According to Monroe, Patrick was not officially demoted, but his supervisory authority was taken away.

Between 2007 and 2009, Jeff Wilson, a unit foreman, was reprimanded, placed on a performance improvement plan, and given a poor performance rating for various shortcomings, including mistreating his subordinates. In 2010, Wilson was demoted for creating a hostile work environment for his employees. In 2014, when Wilson yelled at his former supervisor about a performance rating Wilson had received, he was given the option to resign or be discharged. He chose to resign.

The third employee identified by Monroe, Jim Branson, was disciplined for acting unprofessionally in February 2012 when he told two co-workers to "get away from the f***ing truck" he wanted to drive. According to Monroe, during the incident Branson also threw down a squeegee, cursed, and stomped his feet. Branson was given a three-day suspension

for that infraction. In May 2013, George demoted Branson from the position of unit foreman after he "put his hands" on a co-worker. The document memorializing Branson's demotion stated that he had engaged in "[r]epeated and consistent inappropriate conduct in performing management and supervisory duties which have resulted in diminished ability to effectively manage the operations and personnel of the Indianapolis Sub-District."

## D. INDOT'S Employees Become At-Will Employees

Before July 1, 2011, INDOT employees were considered "non-merit employees." As such, they could appeal suspensions, demotions, and terminations imposed on them and INDOT would need to show "just cause" for the discipline to be upheld. On July 1, 2011, Indiana state law changed and INDOT employees became "unclassified employees." An unclassified employee "is an employee at will …" and "may be dismissed, demoted, disciplined, or transferred for any reason that does not contravene public policy." Ind. Code § 4-15-2.2-24. INDOT employees may still appeal discipline, such as discharge, however INDOT no longer has to show "just cause" for its disciplinary actions. Instead, the burden is now on the former employee to establish that "a public policy exception to the employment at will doctrine was the reason for the employee's discharge." Ind. Code Ann. § 4-15-2.2-42.

## E. Proceedings in the District Court

Monroe filed suit against defendants on February 20, 2014 alleging, among other claims, that his discharge constituted disability discrimination and that INDOT failed to reasonably accommodate his disability in violation of the ADA, as

amended, and the Rehabilitation Act. Monroe requested damages, reinstatement, and front pay if reinstatement was not available.[3]

On March 31, 2016, the district court granted defendants' motion for summary judgment. With regard to Monroe's discriminatory termination claim, the district court found that Monroe did not show that INDOT's proffered reason for discharging Monroe was pretextual and he did not identify a similarly situated non-disabled employee who was treated more favorably than he was treated. Concerning Monroe's failure to accommodate claim, the district court determined INDOT was not aware that Monroe had a disability at the time he requested a transfer to the day shift in December 2012 and January 2013 as Monroe had not yet seen a therapist or told INDOT of any disability. Also, the court found Monroe's requested accommodation was not reasonable because there were no day shift positions available. Monroe now appeals the district court's decision to grant defendants' motion for summary judgment on his discriminatory discharge claim. He does not challenge on appeal the district court's decision regarding his failure to accommodate claims.

## II. ANALYSIS

We review the district court's decision to grant defendants' motion for summary judgment *de novo*. *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 488 (7th Cir.

---

[3] On appeal, the parties dispute whether front pay in lieu of reinstatement is barred by the Eleventh Amendment. Because we affirm the district court's grant of defendants' motion for summary judgment, it is not necessary for us to reach this issue.

2014). "Summary judgment is appropriate when the admissible evidence shows that there is no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law." *Id.* (citing *Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014)). "A material fact is one that affects the outcome of the suit." *Id.* While we must construe all the facts and reasonable inferences in the light most favorable to the nonmoving party, "our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Argyropoulos v. City of Alton,* 539 F.3d 724, 732 (7th Cir. 2008) (internal quotation marks and citation omitted).

### A. Standard for Analyzing ADA and Rehabilitation Act Claims

The ADA, as amended, provides, "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to … discharge of employees …" 42 U.S.C. § 12112(a). "To prove a violation of § 12112(a), a plaintiff must show that: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by his disability." *Roberts v. City of Chi.*, 817 F.3d 561, 565 (7th Cir. 2016). To establish the third prong and survive summary judgment, a plaintiff must show a genuine issue of material fact exists regarding whether his disability was the "but for" reason for the adverse action, in this case termination. *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010).

In *Serwatka* we held that "a plaintiff complaining of discriminatory discharge under the ADA must show that his or her employer would not have fired him but for his actual or

perceived disability; proof of mixed motives will not suffice." *Id*. However, this holding applies to the language of the ADA before it was amended by the ADA Amendments Act ("ADAAA"). One of the changes made to the statute under the ADAAA was to change the language from prohibiting employers from discriminating "because of" a disability to prohibiting employers from discriminating "on the basis of" a disability. We noted in *Serwatka*, and in other cases since then, that it is an open question whether the change from "because of" to "on the basis of" changes the "but for" causation standard. *Id.* at 961 n.1; s*ee also Roberts*, 817 F.3d at 565 n.1; *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 n. 2 (7th Cir. 2015). Like the parties in *Roberts* and *Hooper*, the parties in this case have not argued that another causation standard should apply, so we will continue to apply the "but for" causation standard.

To show that disability discrimination was the "but for" reason for the termination, a plaintiff can use either direct or circumstantial evidence. Direct evidence would be an admission that the defendant fired the plaintiff on the basis of his disability. Circumstantial evidence may include

> (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action.

*Bunn*, 753 F.3d at 684 (internal citations omitted).

Some of our previous decisions have referred to this method of proof as the "direct method" of proving disability discrimination. *See, e.g., Hooper*, 804 F.3d at 853; *Bunn* 753 F.3d at 683. In *Hooper* and *Bunn* we noted that a plaintiff may also proceed under the "indirect method" of proving disability discrimination by employing the burden-shifting method established in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Hooper*, 804 at 853; *Bunn*, 753 F.3d at 685. However, since deciding *Hooper* and *Bunn*, we have tried to move away from the many multi-factored tests in employment discrimination cases and decide, when considering the evidence as a whole, "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge …" *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). As will be discussed below, in this case, regardless of the method of proof used, we find there is not sufficient evidence to create a genuine issue of fact that Monroe's disability was the "but for" cause of his discharge.

The Rehabilitation Act, the other statute under which Monroe brings his claims, prohibits programs receiving federal financial assistance from discriminating against an "otherwise qualified individual with a disability … solely by reason of her or his disability …" 29 U.S.C. § 794(a). "Aside from the 'solely by reason of' standard of causation … the Rehabilitation Act incorporates the standards applicable to Title I of the ADA." *Brumfield v. City of Chi.*, 735 F.3d 619, 630 (7th Cir. 2013).

Monroe asserts that the district court should not have granted defendants' motion for summary judgment on his

discriminatory discharge claims because he has sufficient evidence that INDOT's asserted reason for discharging him—that he created a hostile and intimidating working environment for his subordinates—is pretextual, and because he has put forth sufficient evidence that similarly situated non-disabled employees were treated better than he was treated. We disagree with both of Monroe's contentions.

## B. Reason for Discharge Not Pretextual

Monroe claims that the district court improperly ignored evidence he submitted to support his claim that INDOT's proffered reason for its termination of Monroe is pretextual. Specifically, Monroe points to the following issues he believes establish pretext: (1) he received positive performance evaluations for the three years leading up to his termination and therefore he could not have "consistently" exhibited hostile and intimidating behavior; (2) INDOT made a misstatement in its EEOC position statement and indicated that all the employees who were at the January 24 safety briefing complained about Monroe the next day; (3) INDOT made inconsistent statements during discovery regarding whether George told Neuman and Brooks about Monroe's PTSD; and (4) the decision makers discussed Monroe's PTSD before deciding to terminate him. We do not find that these issues, alone or in combination, are sufficient to establish pretext.

"In determining whether an employer's stated reason [for discharge] is pretextual, the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012) (internal quotation marks and citation omitted). "Pretext involves more than just faulty reasoning or

mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Argyropoulos*, 539 F.3d at 736. The issues cited by Monroe in no way show that the legitimate non-discriminatory reason offered by INDOT for Monroe's discharge was a lie or a sham to cover up discriminatory motives.

Although it is undisputed that Monroe received performance evaluations of "Exceeds Expectations" for three years before his discharge, including his last evaluation which was completed less than one month before his discharge, this does not show that INDOT's reason for discharge was pretextual. George was not aware of Monroe's continued and serious mistreatment of his subordinates before seven or eight of them came to him to complain about Monroe on January 25. When that group came to his office, he took appropriate steps, including involving his supervisor Brooks and Neuman from Human Resources. Neuman conducted an extensive investigation, interviewing not only all of Monroe's current subordinates, but contacting former employees as well. Many current and former employees confirmed the complaints made by the original group of employees who had come to George's office on January 25, including that Monroe "consistently" exhibited hostile and intimidating behavior for many months, or perhaps even longer.

It is unfortunate that George did not have the information from the investigation when he filled out Monroe's performance evaluation in early January 2013. However, it is not altogether surprising given that many employees said that Monroe threatened to discharge them and one employee mentioned that when he had complained before he faced retaliation. In summary, Monroe's earlier positive evaluations

do not call into question INDOT's proffered reason for discharge. "Certainly earlier evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken." *Moser v. Ind. Dep't. of Corr.*, 406 F.3d 895, 901 (7th Cir. 2005) (citation omitted).

Similarly, the misstatement INDOT made in the position statement it submitted to the EEOC was not sufficient to establish pretext. In its position statement INDOT indicated that only seven employees were present at Monroe's safety briefing on January 24, and that all seven employees went to George's office to complain about Monroe after their shift ended on January 25. In fact, Monroe supervised eighteen employees so, if none was absent, presumably there were eighteen employees at the safety briefing and not all of them went to complain to George on January 25. While it is more compelling to say that all employees at a meeting went to complain about their supervisor after the meeting, it is not insignificant that seven or eight of eighteen employees went to complain. In short, INDOT's erroneous statement, while careless, is not significant enough to create a genuine issue of fact regarding whether INDOT's proffered reason for Monroe's discharge was pretextual. *See Lane v. Riverview Hosp.*, 835 F.3d 691, 697 (7th Cir. 2016) (erroneously telling EEOC that decision maker was not aware of an allegation against a comparator is not sufficient to support an inference of discrimination when there was no other evidence "corroborating unlawful intent").

The issue of whether George told Brooks and Neuman about Monroe's PTSD is similarly insignificant. George testified that he did not tell Brooks and Neuman about Monroe's PTSD, and Neuman testified that George did tell him that

Monroe said he had PTSD. However, this disagreement is irrelevant because it is undisputed that Monroe himself told Brooks and Neuman about his PTSD during their meetings on January 28 and January 29. Monroe cannot establish pretext by pointing to a disagreement between two defense witnesses regarding an insignificant detail.

Finally, the fact that the decision makers discussed Monroe's statement that he had PTSD during the meeting at which they decided to discharge him does not establish that their stated reason for discharge was a pretext for discrimination. According to Neuman, the decision makers discussed whether Monroe actually had PTSD, given the fortuitous timing of his disclosure and given Monroe's failure to submit any documentation from a health care provider confirming the diagnosis. It is illogical for Monroe to argue that the discussion here about whether he had PTSD shows an intent to discriminate against him because he had PTSD.

Moreover, even if the decision makers believed Monroe had PTSD, and that his PTSD caused him to not be able to sleep and to be volatile toward his subordinates, this still would not establish pretext. "[A]n employer may, consistent with the ADA and the Rehabilitation Act, terminate an employee for inappropriate behavior even when that behavior is precipitated by the employee's disability …" *Felix v. Wisconsin Dep't. of Transp.*, 828 F.3d 560, 574 (7th Cir. 2016).

In summary, the issues raised by Monroe, neither individually nor in combination, establish that INDOT's stated reason for Monroe's discharge is pretextual. Monroe cannot establish pretext by pointing to a positive performance evaluation filled out before an extensive investigation revealed his misconduct toward his subordinates. Similarly, highlighting

a relatively minor misstatement in an EEOC position statement or a disagreement among defense witnesses about an irrelevant detail cannot establish pretext. Finally, the fact that the decision makers questioned the veracity of Monroe's statement that he had PTSD in no way supports the contention that INDOT's stated reason for discharging Monroe was a lie meant to cover up disability discrimination.

## C. Monroe's Comparators Are Not Similarly Situated

Monroe identified three non-disabled INDOT employees, Jim Patrick, Jeff Wilson, and Jim Branson, who Monroe contends engaged in misconduct similar to his and were not discharged. Monroe asserts that INDOT's failure to discharge the non-disabled employees shows that his discharge was "on the basis of" or "solely because of" his disability. We agree with the district court that none of the three comparators named by Monroe was similarly situated to him and therefore they cannot be used by Monroe to create a genuine issue of fact regarding whether Monroe's disability was the "but for" or "sole" cause of his termination.

"In order for an individual to be similarly situated to the plaintiff, the plaintiff must show that the individual is 'directly comparable to her [or him] in all material respects.'" *Burks v. Wis. Dep't. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). "The similarly situated inquiry is a flexible, common-sense one that asks, at bottom, whether 'there are enough common factors … to allow for a meaningful comparison in order to divine whether intentional discrimination was at play.'" *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007) (quoting *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007)). Generally, a plaintiff must show that his comparators

"dealt with the same supervisor, were subject to the same standards and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008) (internal quotation marks and citations omitted).

Jim Patrick was not similarly situated to Monroe for a number of reasons. First, Monroe submitted very little evidence regarding Patrick's misdeeds. Monroe testified at his deposition that four out of five foremen supervised by Patrick complained about Patrick for "belittling" his subordinates and "undermining" them by changing the work plans at the last minute. Monroe did not give any details regarding what Patrick said or did to "belittle" his subordinates and he did not say for how long the behavior had been occurring. Based on this sparse description, Monroe failed to establish that Patrick's behavior was at all comparable to Monroe's behavior of creating a hostile and intimidating work environment over a period of months (or perhaps even longer) that included targeting an employee because of his hearing impairment.

Another reason Patrick was not similarly situated to Monroe is because none of the supervisors involved in Monroe's discharge was involved in the decision to take away Patrick's supervisory responsibilities in 2009 or 2010. Monroe tries to indicate in his brief that George was the decision maker, but the portion of the record to which Monroe cites does not support that contention. Furthermore, George explicitly stated in his affidavit that he never imposed any discipline on Patrick and that none of the persons involved in the decision to terminate Monroe disciplined Patrick.

An additional reason why both Patrick and Jeff Wilson were not similarly situated to Monroe is because at the time Patrick and Wilson engaged in misconduct arguably similar to Monroe's and were not fired, before July 1, 2011, INDOT employees could be discharged only if INDOT could show "just cause" for the discharge. After July 1, 2011, all INDOT employees became "unclassified" or "at will" employees. So, after July 1, 2011, INDOT no longer had to show "just cause" for discipline. Instead, an INDOT employee could successfully appeal a discharge only if the employee could show that "a public policy exception to the employment at will doctrine was the reason for the employee's discharge." Ind. Code Ann. § 4-15-2.2-42. As George noted in his affidavit, "during the last few years INDOT has taken a much firmer stance on issues involving negative and hostile behaviors in the workplace and mistreatment of subordinates."

Jeff Wilson is a perfect example of this "firmer stance." Between 2007 and 2010, Wilson received a written reprimand, was placed on a performance improvement plan, and was ultimately demoted for various shortcomings including mistreatment of subordinates and creating a hostile work environment. He was not discharged during that time period. However, in 2014, when he angrily approached a former supervisor and yelled at him about a performance review, Wilson was given the option to resign or be discharged. In summary, because Patrick and Wilson engaged in misconduct arguably similar to Monroe's misconduct before the standard for appealing discipline changed from "just cause" to "at will," Patrick and Wilson cannot be deemed similarly situated to Monroe.

Monroe argues that because he was fired on the basis of a disability, his termination falls under the public policy exception to the employment at will doctrine and therefore he should be considered a "just cause" employee like Patrick and Wilson. This argument fails for two reasons. First, as a case cited by Monroe confirms, in Indiana the public policy exception to the employment at will doctrine has been narrowly construed to apply only to persons discharged for filing a workers' compensation claim or for refusing to commit an illegal act. *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 503 (7th Cir. 1999). Second, Monroe has not submitted sufficient evidence to create a genuine issue of fact regarding whether he was fired on the basis of a disability. So he cannot not claim to fall under the public policy exception to the employment at will doctrine, even if it applied to discharges on the basis of a disability, which it likely does not. In short, because Monroe's discharge does not fit into the public policy exception to the employment at will doctrine, he was not a "just cause" employee and therefore he was not similarly situated to Patrick and Wilson.

The only comparator identified by Monroe who engaged in misconduct arguably similar to Monroe's misconduct after July 1, 2011 and who was not fired was Jim Branson. However, upon closer inspection, it is evident that Branson's misconduct was not as egregious as Monroe's and therefore the two employees are not similarly situated. As discussed above, Branson was disciplined in 2012 for telling two co-workers to "get away from the f***ing truck" he wanted to drive, throwing down a squeegee, and stomping his feet. In 2013, he was demoted after a co-worker stated that Branson "put his hands on" him. The wording used in Branson's demotion document

("[r]epeated and consistent inappropriate conduct in performing management and supervisory duties") sounds similar to the wording used in Monroe's termination letter ("consistently exhibit[ing] hostile and intimidating behavior in the execution of [his] responsibilities to the employees … assigned to [his] supervision"). Yet, the conduct of the two men was quite distinguishable.

While we agree that a supervisor swearing at a co-worker or putting his hands on a co-worker is serious misconduct, these were apparently two individual incidents occurring over a year apart. In contrast, according to many of Monroe's current and former subordinates, Monroe created a hostile and abusive work environment for his subordinates over a lengthy period of time, including targeting an employee with a hearing disability. Monroe's behavior was so extreme that it culminated in many of his subordinates going to Monroe's supervisor and stating that they could no longer work under Monroe. In summary, while neither Branson nor Monroe acted in an appropriate manner for a supervisor, Monroe has not submitted sufficient evidence to show that Branson's failings were comparable to his own failings. *See, e.g.*, *Henry*, 507 F.3d at 566 (plaintiff's conduct deemed "more egregious" than other employees' conduct and therefore other employees not similarly situated); *Burks*, 464 F.3d at 751-52 (comparators not similarly situated because they did not have a "comparable set of failings" to plaintiff). Therefore, the district court was correct to grant defendants' motion for summary judgment.

### III. CONCLUSION

The judgment of the district court is AFFIRMED.