In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-1702

JERRY L. LEWIS,

*Plaintiff-Appellant*,

*v.*

ROBERT WILKIE,
*Secretary of Veterans Affairs*,
*United States Department of Veterans Affairs*,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 16-cv-1092 — **Pamela Pepper**, *Judge*.

ARGUED SEPTEMBER 27, 2018 — DECIDED NOVEMBER 29, 2018

Before FLAUM, MANION, and SYKES, *Circuit Judges*.

MANION, *Circuit Judge*. Jerry Lewis is an employee of the United States Department of Veterans Affairs (the "Agency"). Lewis worked as a cook in the Nutrition and Food Service Department from December 2008 until September 2009 and then again from December 2013 until April 2015. The four-year gap in employment from 2009 to 2013 occurred because Lewis was

terminated and then, after a successful Equal Employment Opportunity (EEO) complaint, was reinstated to his former position.

Lewis alleges that upon reinstatement he faced retaliation from the Agency and two supervisors for his EEO activity. The district court granted summary judgment to the Agency, holding in part that none of the alleged retaliatory actions constituted a materially adverse action. We agree with the district court's thorough analysis and conclusion and affirm the judgment.

## I.  Background

### A.  Factual Background

In December 2008, the Agency hired Lewis as a cook in the Nutrition and Food Service Department. In this position, Lewis was supervised by John Schmidt (the Agency's chief of food production) and Jean Wroblewski. In September 2009, his employment was terminated at the recommendation of Schmidt and the request of Wroblewski. Lewis filed an EEO complaint alleging discrimination based on race, age, and retaliation, and a hostile work environment. In September 2013, the EEO Administrative Law Judge found in favor of Lewis on the claim of retaliation alone and ordered the Agency to reinstate Lewis to his former position. The Agency was also ordered to provide Lewis with a six-month training period, a mentor, and weekly meetings between Lewis and the mentor.

Lewis was reinstated in December 2013 to his previous position, again reporting to Schmidt and Wroblewski. He ultimately requested and received a transfer in April 2015 to a different department after he experienced what he alleges was unlawful retaliation for his 2009 EEO complaint. Lewis

specifically recites eleven incidents that he alleges constituted retaliation. Ten of these incidents can be grouped in three categories: incidents involving Agency administrative failures; incidents involving his supervisor Schmidt; and incidents involving his supervisor Wroblewski. The eleventh incident involved a 60-day performance review that the Agency required him to sign. We discuss each of these incidents below.

### 1. Incidents Involving Agency Administrative Failures

Lewis alleges three incidents of administrative failures attributable to the Agency in general rather than any individual member of management. First, Lewis asserts that the Agency failed to provide him with a locker upon his return to work. On his first day back to work, the Agency did not give Lewis a locker in which to store his personal belongings and clothing. He asked Schmidt to assign him a locker, and Schmidt directed him to request one from facility/building management. When Lewis did so, he was told that none were available.

Schmidt told Lewis he could change into his work uniform and store his belongings in Schmidt's office, but Lewis declined because the office was a cubicle with wide-open windows. Schmidt suggested that he simply wear his uniform to work, but he refused this too, asserting it would be a violation of the sanitation policy. Schmidt then became frustrated and told Lewis that he would have to figure out some way to come to work in his uniform. Either that same day or the next day, the Agency provided a locker after Lewis brought his complaint to the Agency's EEO Program Manager. Lewis alleges that this difficulty caused him stress, anxiety, and fear.

Lewis next alleges that he did not receive a paycheck on December 20, 2013, the first regularly scheduled payroll date after his reinstatement. He had returned to work on December 2, 2013, for three days of training, and then took medical leave from December 5, 2013, until January 6, 2014. He filed a complaint of reprisal with the Agency's Office of Resolution Management on December 31, 2013, when he did not receive his first paycheck on December 20. The Agency ultimately resolved this issue and he received the payment in February 2014. Lewis asserts that the delayed paycheck was disrespectful and manipulative and that it caused him stress.

Finally, Lewis alleges that his pay rate was improperly reduced. On January 3, 2014, he received his first paycheck after reinstatement, but the amount was approximately $1.50 an hour less than his payrate. This issue was not resolved until March 2014. He alleges that dealing with the Agency regarding this incident caused him stress and frustration, and he testified that it felt as though the Agency had a vendetta against him.

### 2. Incidents Involving Schmidt

Lewis alleges five incidents that specifically involve his supervisor Schmidt. First, Schmidt gave Lewis unwarranted counseling about organizing the freezer. Sometime during the second week of January 2014, Schmidt confronted Lewis and accused him of maintaining a disorganized freezer. According to Lewis, however, the freezer only looked disorganized because Schmidt ordered too much food. Lewis asserted that Schmidt had adjusted the quantities on the food order based on his distrust of Lewis's judgment, and that the resulting oversupply caused the disorganization. Although this incident led to what Lewis refers to as "unwarranted counseling,"

he does not allege that he was otherwise disciplined in connection with this incident. He alleges that it caused him to be stressed, fearful, and nervous.

Second, Lewis claims Schmidt altered Lewis's work schedule and subsequently threatened to discipline him when Lewis left early because of the alteration. This incident began one afternoon when Schmidt instructed Lewis to come to work at 6:00 a.m. the following day to cover the shift of a coworker scheduled to work from 6:00 a.m. to 2:30 p.m. (Lewis's normal shift was 6:30 a.m. to 3:00 p.m.). Based on Schmidt's instruction to come early, Lewis worked from 6:00 a.m. to 2:30 p.m. the next day. The following day, Schmidt called a meeting with Lewis and a union steward in which he scolded Lewis for leaving "early" at 2:30 p.m., told him to pay attention to the schedule and follow it verbatim, and stated that it "could be a discipline thing" if Lewis left early. Nevertheless, Lewis received no further discipline as a result of this incident. Lewis alleges that this event caused him to have difficulty concentrating on his work and led him to speak to the Agency's EEO program manager to request a department transfer.

The third incident involving Schmidt relates to the Agency's sign-out procedure. According to this procedure, whenever an employee leaves the department for any reason other than lunch or usual work breaks, he is required to sign out and to sign in upon return. In February 2014, Schmidt instructed Lewis that he was required to sign out whenever he left the department to attend his weekly mentor meetings ordered by the ALJ. Lewis alleges that Schmidt had not checked the sign-out sheet to see if he was already complying with this

procedure before instructing him to do so. He asserts that because of this incident, he felt stress, anxiety, fear, and lack of focus. He does not allege that he was disciplined in relation to this incident.

In the fourth incident Lewis cites, Schmidt questioned Lewis about his whereabouts after Lewis left the department to use the restroom. According to the Agency's policy, employees are not required to sign out when leaving the department to use the restroom. In his EEO hearing testimony, Lewis stated that once he told Schmidt he had only gone to use the restroom, Schmidt did not question him further. Lewis does not allege that he was disciplined in relation to this incident.

Finally, in the fifth incident, on January 14, 2014, Schmidt called Lewis to meet to discuss Lewis's request for additional administrative leave but required a witness to be present before he would discuss it with him. Lewis alleges that Schmidt did not require a witness to be present during conversations with any other employee. According to Schmidt, he required a witness because Lewis's 2009 EEO complaint falsely accused him of saying things he never said, and he wanted a witness to protect himself from false accusations. He testified that no other employee had ever accused him of saying something he did not say.

Once two witnesses were present, Schmidt met with Lewis and told him that his request for administrative leave had been denied. Lewis testified that this incident caused him stress, anxiety, and made him feel like a misfit.

### 3. *Incidents Involving Wroblewski*

Lewis alleges two incidents involving his supervisor Wroblewski. First, Lewis alleges that on January 14, 2014, Wroblewski instructed Lewis's coworkers to monitor his whereabouts. He alleges he learned about this when a coworker, Latoya Dixon,[1] told him that Wroblewski had so instructed her and the department supervisors, and that she and other coworkers were monitoring his movements within the department. Lewis did not feel the need to investigate further about why his location was being monitored, testifying that "[t]his is something they do in [Lewis's] unit."

Dixon, on the other hand, stated in her deposition that she had not been instructed by Wroblewski to monitor Lewis, that no one told her they were monitoring him, and that she did not monitor him, but that she knew it was going on and her personal belief was that Wroblewski wanted Lewis out of the department because of his 2009 EEO complaint.

Second, Lewis alleges that he learned from various coworkers that Wroblewski had instructed a coworker, Jason Borgwardt, to gather negative information about him. Lewis's history with Borgwardt is a troubled one. His 2009 EEO complaint alleged that Borgwardt, along with two other cooks, had verbally harassed him and intentionally made it difficult for him to do his job. Another coworker testified that Borgwardt had more than once stated Lewis should never have been reinstated and that he had "worked the system."

---

[1] Throughout the briefs and record, Dixon's first name is alternately spelled Latoya, LaToya, or Latonya. We adopt the spelling given by Dixon in her deposition and used by the district court. (Doc. 15-6, Tr. of Latoya Dixon Deposition, at 3.)

The testimony regarding the instruction from Wroblewski to Borgwardt is inconsistent. At the EEO hearing, Borgwardt stated that Wroblewski was receiving multiple complaints from employees regarding Lewis's performance, so she instructed Borgwardt to notify the other cooks that if there were any more instances of Lewis being negligent in his responsibilities, they were to let Borgwardt know. Borgwardt claimed he was instructed to write any such complaints down and give them to Wroblewski so that she could identify the areas in which Lewis needed to be retrained. Borgwardt gathered this information for approximately thirty days and he claimed that he gave handwritten notes to Wroblewski on roughly five to six occasions.

Borgwardt testified that he told Schmidt about Wroblewski's directive, and that Schmidt disagreed with the directive. Schmidt initially testified that he had no knowledge of Wroblewski's instruction to Borgwardt, but ultimately recalled that Borgwardt had mentioned it.

Wroblewski's testimony was that she did not specifically recall receiving any complaints about Lewis after his 2013 reinstatement. She testified that she never instructed Borgwardt to gather information about Lewis and that she did not recall receiving any such information from Borgwardt.

Lewis testified that Borgwardt's efforts to gather negative information about him caused him to work in continual fear, and that he felt stress, anger, and nervousness. He complained to the Agency's HR department and requested a department transfer, but the Agency did not follow up with his complaint. As with the other incidents, Lewis does not allege that Borgwardt's note-taking ever led to any discipline, reprimand, or change in his job responsibilities.

### 4. *The 60-Day Performance Review*

Finally, Lewis alleges that the Agency subjected him to an adverse employment action by requiring him to sign a 60-day performance review even though Lewis was not a probationary employee. The performance review is a checklist that addresses an employee's progression on the job. Lewis was given the same performance review that the Agency required for any employee in a new position and his review was positive. The Agency took no discipline or negative employment action against him in connection with the review. Nevertheless, because the form used for this review was labeled as a "probationary evaluation," Lewis felt it was retaliatory. He asserts that he felt offended and intimidated by the review.

## B. Procedural Background

Lewis filed a new EEO complaint in 2014, alleging each of the above eleven incidents constituted an adverse action and caused him stress, anxiety, fear, worry, and nervousness. The ALJ ruled against him. Lewis then filed this civil action in district court, asserting a Title VII retaliation claim against the Agency. The complaint did not include a hostile work environment claim.

The Agency filed a motion for summary judgment after discovery, and the district court granted that motion. After thoroughly recounting the facts and analyzing the law, the district court held that none of Lewis's alleged retaliatory actions constituted a materially adverse action. The district court also analyzed other elements of the Title VII retaliation claim and held that Lewis failed to establish causation for ten of the eleven incidents; failed to identify any similarly-situated comparator; and failed to demonstrate that the

Agency's legitimate, non-discriminatory explanations were pretextual.

## II. Analysis

A district court's grant of summary judgment is reviewed *de novo*, construing all facts and drawing all reasonable inferences in favor of the party against whom judgment was granted. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). Importantly, "our favor toward the non-moving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008)). A district court may properly grant summary judgment when "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Argyropoulos*, 539 F.3d at 732 (citing FED. R. CIV. P. 56(a)). It is the movant's burden to demonstrate the absence of genuine issues of material fact. *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015). If accomplished, "the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial." *Id.*

### A. Title VII Retaliation

Title VII prohibits an employer from retaliating against an employee for opposing or participating in an investigation of an unlawful employment practice. 42 U.S.C. § 2000e-3(a); *see also Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). To prevail on a Title VII retaliation claim, the plaintiff must prove that (1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and

(3) there is a causal link between the protected activity and the adverse action. *Lord*, 839 F.3d at 563.

Over the years, courts in this Circuit have discussed two methods through which a claimant may prove a *prima facie* retaliation claim: the "direct" method and the "indirect" method. The direct method requires the plaintiff to simply present evidence satisfying the elements of the retaliation claim: (1) he engaged in a protected activity, (2) he suffered an adverse action, and (3) a causal connection exists between the activity and the adverse action. *Sitar v. Ind. Dep't. of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003).

The indirect method, by contrast, refers to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). That method allows the plaintiff to establish a *prima facie* case without proving a direct causal link by showing that (1) he engaged in a protected activity, (2) he performed his job duties according to his employer's legitimate expectations, (3) he suffered an adverse action, and (4) he was treated less favorably than similarly situated employees who did not engage in protected activity. *Sitar*, 344 F.3d at 728. If the plaintiff can establish his *prima facie* case with this indirect method, the burden then shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse action. *Adusumilli v. City of Chicago*, 164 F.3d 353, 362 (7th Cir. 1998). If the employer does so, the burden shifts back to the employee to prove that the employer's stated reason is mere pretext. *Sitar*, 344 F.3d at 728.

In *Ortiz v. Werner Enterprises*, 834 F.3d 760, 763 (7th Cir. 2016), we cautioned that these two methods are "just means

to consider whether one fact … caused another … and therefore are not 'elements' of any claim." We warned district courts not to split evidence into categories of "direct evidence" and "indirect evidence," but to instead evaluate the evidence as a whole to determine if it "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 764–65.[2]

We did not reject or alter the *McDonnell Douglas* burden-shifting framework in *Ortiz*; we simply clarified that there are not separate classifications of evidence to be evaluated under different standards, and we eliminated unhelpful surplus tests. *Id.* at 766; *see also Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) ("Nothing in *Ortiz* … displaced the burden-shifting analysis established in *McDonnell Douglas*."). In the wake of *Ortiz*, "[t]he *McDonnell Douglas* framework is just 'a formal way of analyzing a discrimination case when a certain kind of circumstantial evidence—evidence that similarly situated employees not in the plaintiff's protected class were treated better—would permit a jury to infer discriminatory intent." *Ferrill*, 860 F.3d at 499–500. The district court in this case outlined the complicated history of the case law on this point and then proceeded to evaluate the evidence as a whole. *Lewis v.*

---

[2] Although *Ortiz* dealt generally with employment discrimination claims, we have applied its holding in the context of retaliation claims as well. *See, e.g.*, *Rowlands v. United Parcel Service–Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018); *Lord*, 839 F.3d at 563.

*McDonald*, No. 16-cv-1092-pp, 2018 WL 1135555, at *10–11 (E.D. Wis. Feb. 28, 2018).

There is no dispute that Lewis engaged in statutorily pro-tected activity by filing his 2009 EEO complaint. Indeed, we have said that formal EEOC charges are "the most obvious form of statutorily protected activity." *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 740 (7th Cir. 2011), *overruled on other grounds by Ortiz*, 834 F.3d 760 (7th Cir. 2016)). Thus, Lewis has demon-strated the first element of his claim. The district court, how-ever, held that Lewis did not show he suffered a materially adverse action. Additionally, the district court held that even if Lewis had suffered an adverse action, he did not establish a causal connection for many of the incidents, did not identify a similarly situated employee, and did not rebut the Agency's non-discriminatory explanations. We begin by addressing the lack of a materially adverse action.

## B.  No Materially Adverse Action

Lewis first disputes the district court's holding that he failed to demonstrate any materially adverse action. For Title VII retaliation purposes, a materially adverse action "need not be one that affects the terms and conditions of employment, but it 'must be one that a reasonable employee would find to be materially adverse such that the employee would be dis-suaded from engaging in the protected activity.'" *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016) (quoting *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007)).

The Supreme Court has cautioned that "it is important to separate significant from trivial harms," and that Title VII "does not set forth 'a general civility code for the American

workplace.'" *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Title VII's anti-retaliation provision does not protect an employee against "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*; *see also Poullard*, 829 F.3d at 857. The provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N.*, 548 U.S. at 67. Considering this, we held in *Poullard* that an employer's unfulfilled "threats of unspecified disciplinary action" did not constitute adverse actions, though such threats "may well be relevant evidence of retaliatory intent behind a more concrete adverse action." *Poullard*, 829 F.3d at 856–57.

The district court completed a fact-intensive review of Lewis's eleven alleged retaliatory actions and found that none constituted a materially adverse action.[3] We agree.

### 1. *Incidents Involving Agency Administrative Failures*

With respect to the three incidents of the Agency's administrative failures (the failure to provide a locker, the delayed

---

[3] Importantly, Lewis's complaint asserts only a claim of retaliation, and not a hostile work environment claim. A hostile work environment claim provides a remedy under Title VII when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). Although a hostile work environment may stem from retaliatory harassment, *see Hobbs v. Chicago*, 573 F.3d 454, 464 (7th Cir. 2009), it is a separate claim from retaliation. Since Lewis did not assert this claim, the district court was not faced with the question of whether the aggregate effect of all eleven incidents constituted

paycheck, and the short paycheck), the district court correctly concluded that these were simply isolated administrative errors that were resolved. These actions did not cause Lewis lasting harm or injury sufficient to dissuade a reasonable employee from engaging in protected activity. Although frustrating, these incidents were isolated events and represent the kind of minor workplace grievances against which Title VII does not protect. *See Burlington N.*, 548 U.S. at 68. These incidents do not rise to the level of materially adverse actions.

### 2. *Incidents Involving Schmidt*

Regarding the five incidents involving Schmidt, these also do not rise to the level of materially adverse actions. Four of these incidents (when Schmidt told Lewis to keep the freezer organized, altered Lewis's schedule and then reprimanded him for leaving early, told Lewis he needed to sign out for mentor meetings, and questioned Lewis about his whereabouts after he had gone to the restroom) amount to Lewis being falsely accused or receiving unneeded instructions from Schmidt. These incidents may have resulted in annoyance and frustration, but they did not cause the kind of harm that would dissuade a reasonable employee from engaging in protected activity. Lewis received no further discipline nor suffered any lasting detriment related to any of these incidents. The most significant of these four incidents was the reprimand and threat of discipline after Lewis left work "early" following Schmidt's alteration of his work shift. The record,

---

a "sufficiently severe or pervasive" hostile environment, but simply whether any of the alleged retaliatory incidents, considered independently, constituted an adverse action. *See Boss v. Castro*, 816 F.3d 910, 917–18 (7th Cir. 2016) (explaining that a "totality of the circumstances" approach is limited to hostile work environment claims).

however, shows that this issue was taken no further, and Lewis was not disciplined.

One incident involving Schmidt does stand out from the others: Schmidt's requirement that a witness be present during his conversation with Lewis about his administrative leave request. By Schmidt's own admission, this requirement was directly linked to Lewis's 2009 EEO activity. Furthermore, Lewis alleges that Schmidt only placed this requirement on him, thus treating him differently than all other employees. A supervisor requiring a witness to be present during a conversation with an employee may well be inconvenient and even embarrassing for that employee. However, the purpose of the meeting between Schmidt and Lewis was simply for Schmidt to convey to Lewis that his request for further administrative leave was denied. Those facts do not present a circumstance in which the witness requirement would dissuade a reasonable employee from exercising his rights.

### 3.  Incidents Involving Wroblewski

The district court recognized that the first incident involving Wroblewski, namely Lewis's allegation that Wroblewski instructed Lewis's coworkers to monitor him, does not have substantial factual support, even construing the facts in the light most favorable to Lewis. Lewis alleged that his coworker, Latoya Dixon, told him that Wroblewski had instructed her and others to monitor Lewis's whereabouts. However, Dixon testified that Wroblewski never asked her to monitor Lewis and she never did. While she believed the Agency and its management were out to get Lewis because of his EEO activity, she did not provide a basis for this belief. The district court properly determined that there was no evidence supporting the allegation that Wroblewski instructed

anyone to monitor Lewis's location or that anyone actually did so. Furthermore, even if this monitoring did occur, there is no evidence it caused Lewis harm or injury. He was not disciplined in connection with the alleged monitoring. The knowledge that supervisors are monitoring one's location while at work would not dissuade a reasonable employee from engaging in protected activity.

Regarding Lewis's allegation that Wroblewski instructed Borgwardt to solicit negative information about Lewis (and only about Lewis) from Lewis's coworkers and that Borgwardt did so for a period of 30 days, he contends that the district court applied the wrong standard in analyzing this allegation. Namely, Lewis argues that the district court improperly relied upon *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1030 (7th Cir. 2004), which stated "it is well established that unfulfilled threats that result in no material harm cannot be considered an adverse employment action under Title VII." The district court concluded that the facts showed at most an implicit threat of discipline that never materialized, "which is not enough to constitute an adverse employment action under Seventh Circuit law." *Lewis*, 2018 WL 1135555, at *15. Lewis acknowledges that *Hottenroth* involved a Title VII retaliation claim but asserts that *Hottenroth* relies on a line of cases dealing with Title VII discrimination claims, not retaliation. *See Ajayi*, 336 F.3d 520, 531 (citing *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002)). Lewis argues that the district court thus applied the Title VII discrimination standard for adverse action rather than the proper standard in a retaliation context. This argument is unavailing.

First and foremost, regardless of the cases it cited, *Hottenroth* was a Title VII retaliation case, as Lewis acknowledges.

He points to no precedent contradicting *Hottenroth* or holding that unfulfilled threats resulting in no material harm can be adverse actions in a Title VII retaliation context. He instead supports his argument by reciting the *Burlington Northern* standard—that an action is materially adverse if it would likely dissuade a reasonable employee from engaging in protected activity—and argues that Wroblewski's instruction to Borgwardt meets that standard. *See Burlington N.*, 548 U.S. at 67–68. But the district court also stated this standard in its discussion of adverse actions in a Title VII retaliation claim. *See Lewis*, 2018 WL 1135555, at *11 (citing *Poullard*, 829 F.3d at 856). Lewis's argument that the district court failed to apply the correct standard is without merit.

Moreover, even setting aside *Hottenroth* and the cases it relied upon, there is ample precedent in this Circuit and in Supreme Court case law supporting the proposition that an adverse action in the Title VII retaliation context must produce a material injury or harm, and that unfulfilled threats do not meet that standard. *See, e.g.*, *Burlington N.*, 548 U.S. at 67 (stating the anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm"); *Poullard*, 829 F.3d at 856–57 (holding threats of unspecified future discipline were not materially adverse actions); *Stephen v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (affirming "[f]ederal law protects an employee only from retaliation that produces an injury"); *Dunn v. Wash. Cty. Hosp.*, 429 F.3d 689, 692 (7th Cir. 2005) (holding statements implying an

employer would do what he could to impede the plaintiff's career did not cause any injury and were not adverse actions).

In *Poullard*, we held that an employer's threats of unspecified discipline having no effect on the plaintiff's compensation or career prospects and producing no injury were not adverse actions:

> While we do not doubt that the possibility of discipline can be stressful, we have previously held that this kind of threat is not enough to support a claim for retaliation. … We do not doubt that threats of future discipline can cause stress or worry, but so too can "petty slights or minor annoyances that often take place at work and that all employees experience," which the Supreme Court has excluded from the bounds of materially adverse actions.

*Poullard*, 829 F.3d at 856–57 (first citing *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009), and then quoting *Burlington N.*, 548 U.S. at 68).

The district court correctly determined that Wroblewski's and Borgwardt's conduct constituted, at most, an implicit threat of future discipline, but resulted in no injury or harm greater than stress and worry, and thus did not constitute an adverse action. While this kind of unfulfilled threat of discipline "may well be relevant evidence of retaliatory intent behind a more concrete adverse action," it does not constitute a materially adverse action in and of itself. *Id.* at 857.

### 4.  *The 60-Day Performance Review*

Finally, regarding the 60-day performance review, Lewis alleges that this constituted an adverse action because he was not a probationary employee, and therefore should not have

been treated like one. Lewis, however, was not singled out by this requirement because every employee who changes jobs or is promoted at the Agency is required to complete such a performance review. Lewis's performance review results were positive. Furthermore, the ALJ's order resulting from Lewis's 2009 EEO case required the Agency to provide Lewis with retraining and mentoring.

Lewis may have disliked the performance review, but "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). The review was a standard company requirement for employees in new positions and did not result in any injury or harm to Lewis. The review was not likely to dissuade a reasonable employee from exercising his rights, and thus the district court properly concluded that this did not constitute an adverse action.

### C. No Causal Link, Similarly Situated Comparators, or Demonstration of Pretext

Although the district court's holding that Lewis failed to demonstrate any materially adverse action was dispositive, the court went further and held that Lewis also failed to demonstrate a causal link between his protected activity and nearly all of the alleged retaliatory actions;[4] that he failed to identify any similarly-situated employee; and that he failed to demonstrate the Agency's legitimate, non-discriminatory explanations were pretextual. Lewis argues that each of those

---

[4] Regarding Schmidt's requirement that a witness be present during his conversation with Lewis, the district court held that "there is a causal connection, but no adverse employment action." *Lewis*, 2018 WL 1135555, at *16.

conclusions was wrong. He also argues that the district court confused the direct and indirect methods of proof by requiring him to identify a similarly-situated employee and demonstrate pretext rather than separately analyzing his claim under the direct method of proof which requires neither.

Because we are affirming the district court's holding on the dispositive issue that none of the alleged retaliatory actions constituted a materially adverse action, we need not reach an analysis of the questions of causal connection, similarly-situated employees, or pretext. We do note, however, that Lewis's assertion that the district court confused the direct and indirect methods of proof and failed to separately analyze his claim under the direct method is a misrepresentation of the district court's opinion and a misunderstanding of our holding in *Ortiz*.

The district court very clearly set forth this Circuit's case law regarding the two methods, and then followed *Ortiz*'s directive to analyze the evidence as a whole to determine "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [protected activity] caused the … adverse employment action." *Ortiz*, 834 F.3d at 765. For a reasonable factfinder to find in Lewis's favor, the evidence would have to establish either a causal connection between Lewis's protected activity and the adverse action he suffered or else support an inference of retaliatory motive. *Sitar*, 344 F.3d at 728; *c.f. Ferrill*, 860 F.3d at 499–500 (describing the *McDonnell Douglas* burden-shifting framework in a discrimination claim context as a means to analyze evidence supporting an inference of discriminatory intent). The district court assumed only for the sake of argument that Lewis had suffered a material adverse action. The court determined that

Lewis had not presented evidence of a causal connection for any of the alleged retaliatory actions save one (the witness requirement). The court then proceeded to analyze whether Lewis had identified a similarly situated employee or rebutted the Agency's non-discriminatory explanations as pretextual. Both elements (similarly situated employees and pretext) are necessary for a factfinder to infer a retaliatory motive under the *McDonnell Douglas* framework. *Sitar*, 344 F.3d at 728.

The district court's method was an appropriate way to conduct the analysis in light of *Ortiz*, where we were "concerned about the proposition that evidence must be sorted into different piles, labeled 'direct' and 'indirect,' that are evaluated differently." *Ortiz*, 834 F.3d at 766. We instructed instead that "all evidence belongs in a single pile and must be evaluated as a whole." *Id.* The district court did exactly that.

### III. Conclusion

For the reasons stated above, we AFFIRM the decision of the district court.